**UNITED STATES of America**

v.

**Oliver L. NORTH.**

**Crim. No. 88–0080–02.**

United States District Court,
District of Columbia.

Nov. 29, 1988.

---

## MEMORANDUM AND ORDER

GESELL, District Judge.

Re: *Defendant North's Motions to Dismiss Counts 5, 6, and 7, Charging North with Making False Statements to Congress.*

Each of North's motions urging dismissal of counts 5, 6, and 7 which charge him with making false statements to Congress in violation of 18 U.S.C. § 1001 is denied. In a series of overlapping, somewhat repetitive motions,[1] North has urged that these counts must be dismissed for numerous reasons, most of which relate more to policy than to law.

### A. Facts.

The Independent Counsel has outlined the factual background of the charges from his viewpoint as follows. In the summer and fall of 1985, press reports sparked two committees of the House of Representatives to institute inquiries directed towards North's conduct regarding advice and fund-raising support to the Nicaraguan rebel leaders. North was then a Marine detailed to the National Security Council. Both of these committees had jurisdiction under the Rules of the House over the matters in question.[2] The letters, sent by The Honorable Michael Barnes, Chairman of the Subcommittee on Western Hemisphere Affairs of the House Foreign Affairs Committee (HFAC), and the Honorable Lee Hamilton, Chairman of the House Permanent Select Committee on Intelligence (HPSCI), referred explicitly to the Boland Amendment. Chairman Hamilton's letter queried into the "legal justification" for any military support for the contras. Chairman Barnes' letter referred to his subcommittee's jurisdiction over United

---

**1.** These include (# 30) to Dismiss Counts 5, 6, and 7 on the Ground that 18 U.S.C. § 1001 Does Not Apply to the Nonadministrative Functions of Congress; (# 34) to Dismiss Counts 4, 5, 6, 7, and 9 Because of Lack of Fair Notice That the Conduct Charged Was Criminal; (# 49) to Dismiss Counts 1–3, 4–7, 9, and 23 As Based on Novel Legal Theories Beyond the IC's Authority; and (# 31) to Dismiss Counts 5, 6, 7, and 15 on the Ground That They Allege Conduct Within the "Exculpatory No" Exception to 18 U.S.C. § 1001. All these motions are denied insofar as they relate to counts 5, 6, and 7. Motion (# 48) to Dismiss on the Ground that the Independent Counsel had no Lawful Jurisdiction to Investigate or Prosecute the Crimes Charged will be addressed in another memorandum.

**2.** According to the *Rules of the House of Representatives,* House Doc. 98–277, the Committee on Foreign Affairs has responsibility for matters including: Relations of the United States with foreign nations generally; Intervention abroad and declarations of war; and reviewing and studying, on a continuing basis, all laws, programs, and Government activities dealing with or involving ...intelligence activities relating to foreign policy. Rule X, cl.1(i)(1), (6), cl.3(d). In addition, all committees have oversight responsibility, pursuant to Rule X, cl.2. Rule XLVIII outlines the responsibilities of HPSCI. The select committee is referred all proposed legislation, messages, petitions, memorials, and other matters relating to intelligence and intelligence-related activities of all departments and agencies of the Government. Among other duties, the select committee makes regular and periodic reports to the House on the nature and extent of intelligence and intelligence-related activities of the various departments and agencies of the United States.

States policy toward Nicaragua, and requested all documentation of North's contacts with Nicaraguan rebel leaders as of October, 1984. Both letters were on official stationery and each letter was signed by the Congressman in his official capacity as Chairman.

The indictment alleges that North prepared the responses which, to take the letter to HFAC, state in part that

From that review I can state with deep personal conviction that at no time did I or any member of the National Security Council staff violate the letter or the spirit of the law.... It is equally important to stress what we did not do. We did not solicit funds or other support for military or paramilitary activities either from Americans or third parties. We did not offer tactical advice for the conduct of their military activities or their organization.

The indictment alleges that this response and the similar one sent to Chairman Hamilton contain false statements. After receiving the response drafted by North and after meeting with Robert C. McFarlane, the President's National Security Advisor, Chairman Hamilton sought further information concerning allegations about the activities of North, in the form of specific questions developed by Committee members. The indictment alleges that, once again, North prepared responses to the Committee's specific questions for McFarlane to transmit to HPSCI, which falsely stated, among other things, that North did not use his influence to facilitate movement of supplies to the resistance, and that no member of the NSC staff was officially or unofficially raising funds for the Nicaraguan democratic opposition. He did not suggest that the President was not bound by the Boland Amendment, nor did he refuse to answer. Rather, the indictment alleges that he spoke falsely and misled the Committees.

B. Constitutional Argument.

North urges that the criminal statutes proscribing false statements within the jurisdiction of any department or agency cannot be applied to communications between an employee of the Executive Branch and Congress. North proceeds to fashion a constitutional argument, contending that the asserted primacy of the White House in foreign affairs precludes officials working for the Executive from being prosecuted for false statements made to Congress regarding foreign affairs.[3] This argument lacks substance and it misses the point it attempts to make.

Each of the three counts allege false statements made to the House Intelligence Committee, HPSCI. Executive officials have a statutory obligation to provide intel-

---

**3.** Though the parameters of Congress' powers may be contested, Congress surely has a role to play in aspects of foreign affairs, as the Constitution expressly recognizes and the Supreme Court of the United States has affirmed.

The most prominent among these Congressional powers is of course the general appropriations power. Other provisions of the Constitution include the power to provide for the common defence, regulate foreign commerce, declare war, define and punish piracies and felonies committed on the high seas and offenses against the laws of nations, raise and support armies, provide and maintain a navy, make rules for the government and regulation of land and naval forces. And Congress has a check on many constitutionally-assigned Executive powers relating to foreign affairs, through for instance, the confirmation process for treaties and ambassadors.

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952),

*Dames and Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), and *Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), are among the cases recognizing Congress' role in foreign affairs. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), explicitly disavowed that it was addressing the balance between the confidentiality interest and congressional demands for information. *Id.,* at 712, n. 19, 94 S.Ct. at 3109 n. 19.

For examples of statutes in the arena of foreign affairs which provide for congressional checks on executive authority, by requirements for findings, notification or other means, *see, e.g.,* Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801–1811 at § 1802(a)(1)(C) and (a)(2), § 1808; International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1706; Central American Democracy, Peace and Development Initiative, 22 U.S.C. §§ 2271–2276.

ligence information to this Committee on request. 50 U.S.C. § 413(b).[4] More generally, congressional committees act well within their authority when they seek explanation from Executive Branch officials regarding matters that may affect substantive legislative decisions. It is essential that Congress legislate based on fact, not falsifications, in the realm of foreign affairs as well as in domestic legislation.

If Congress is increasing its power in a manner that infringes upon the President's prerogatives, the President may assert executive privilege or direct a person in North's position not to answer. Deliberate falsifications are another matter, and North did not himself have executive privilege. Indeed, the inquiries were directed to McFarlane as the President's National Security Advisor regarding North's personal conduct. North did not simply refuse to answer; he affirmatively deceived Congress, and there is not the slightest suggestion in North's papers that the President instructed North to give false information. He cannot claim any sort of privilege for this.[5] The thought that any one of the hundreds or thousands of persons working for the President can affirmatively and intentionally mislead Congress when it seeks information to perform one of its assigned functions for any reason—including self-interest or the belief that the President would approve—is unacceptable on its face. Such a disdainful view of our democratic form of government has no constitutional substance. Where, as here, power is shared among the branches, willful and deliberate deceit such as North allegedly espouses cannot be excused on constitutional grounds. *See, Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635–637, 72 S.Ct. 863, 870–71, 96 L.Ed. 1153 (J. Jackson, concurring).

**C. Policy Arguments.**

Apart from his constitutional arguments, North's counsel argue in Motion #30 that applying the law to statements to Congress would have untoward effects on constituent communication with their elected officials, communication by persons interested in legislation, and communication from Executive Branch officials and their staffs to Congress. He argues that requiring Executive officials to tell the truth would have a "chilling effect" that "would disrupt the orderly functioning of government." Yet the effects of *not* enforcing the law in these circumstances are surely worse than the consequences of enforcing it, and North's assertion ignores the requirement of criminal intent, that the false statements be made "knowingly and willfully." North seems to state that Executive Branch officials and their staffs habitually and properly lie to Congress. He thus again devalues the democratic premise that sound legislation depends on a free-flowing, accurate stream of information to Congress, from government officials who must execute the laws as enacted. Most officials no doubt find that responding truthfully to congressional inquires is not only in keeping with our structure of shared powers, but that it is also useful to their agencies to build a trusting relationship with Congress. Whatever the practice, Congress has not accepted North's policy contentions, and Congress has set the standard.

The law is clear that Section § 1001 does apply to false statements made to any branch of government: Executive, Legislative or Judicial. *United States v. Bramblett,* 348 U.S. 503, 509, 75 S.Ct. 504, 508, 99 L.Ed. 594 (1955). In light of the broad legal sweep of § 1001, North advances other policy-related arguments for excluding him from the strictures of § 1001. He contends that because § 1001 does not apply to the non-administrative functions of

---

**4.** The House and Senate Intelligence Committees also must be notified of significant intelligence activities pursuant to 22 U.S.C. § 2422.

**5.** Even constitutionally explicit Fifth Amendment privileges do not exonerate affirmative false statements. *United States v. Wong,* 431 U.S. 174, 178, 97 S.Ct. 1823, 1825, 52 L.Ed.2d

231 (1977). As the Court in *Wong* said, "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them." *Id.,* at 180, 97 S.Ct. at 1827, quoting *Bryson v. United States,* 396 U.S. 64, 72, 90 S.Ct. 355, 360, 24 L.Ed.2d 264 (1969).

the Judicial Branch,[6] it *should* be held inapplicable to the non-administrative functions of Congress, and he contends that his statements were made in a non-administrative context. He urges that statements to committee chairmen deserve to be treated like statements in open court to judges, that perjury statutes are adequate safeguards.[7] These policy arguments are addressed to the wrong forum. Not only does the judiciary face somewhat different conditions in a courtroom than Congress faces, but the statute does not allow North's interpretation. Congress may set the policy it expects from those who deal with it. Congress felt that less exacting standards than are included in the perjury statute were appropriate for ensuring the integrity of governmental functions. *United ed States v. Gilliland*, 312 U.S. 86, 95, 61 S.Ct. 518, 523, 85 L.Ed. 598 (1941); *United States v. Rodgers*, 466 U.S. 475, 482–483, 104 S.Ct. 1942, 1947–48, 80 L.Ed.2d 492 (1984).

## D. Fair Warning.

As part of North's ubiquitous "no fair warning" argument, made in Motions # 30, # 34 and # 49, his counsel say that their "research has not disclosed a single conviction under § 1001 based on a statement to Congress that did not relate directly to Congress's administrative or housekeeping functions." (E.g., # 30, at 8). *United States v. Lavelle*, 751 F.2d 1266 (D.C.Cir.), *cert denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985), does, in fact, demonstrate that Executive officials cannot defeat Congress' lawful oversight functions through false statements without exposing themselves to criminal sanction, and the Supreme Court has recently reiterated the

breadth of § 1001 in *United States v. Rodgers*, 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984). North's recitation of unpunished lies by officials is not persuasive evidence that such conduct is lawful.

Moreover, even accepting North's idea that § 1001 encompasses only Congress' administrative functions, North is not exonerated. Administrative functions include not only such matters as honesty in payroll disbursement reports. "Administration" is a broad term relating to supervision of the execution, use or conduct of something. *Webster's Seventh New Collegiate Dictionary*. In these circumstances, Congress was supervising the execution of existing laws. It was administering its lawful functions.

## E. Exculpatory No.

For the reasons similar to those given in the Court's Memorandum of November 10, 1988, North's invocation of the "exculpatory no" doctrine (Motion # 31) with respect to these false statement counts is again rejected. To briefly reiterate: this Circuit has not adopted the doctrine; North is alleged to have affirmatively misled the committees; and if he did what the indictment alleges, his letters sought to impair the lawful governmental functions of the committees receiving the deceptive letters.

North's motions to dismiss counts 5, 6, and 7 are denied.

SO ORDERED.

---

**6.** Dicta in a case from this Circuit, *Morgan v. United States*, 309 F.2d 234 (D.C.Cir.), *cert. denied*, 373 U.S. 917, 83 S.Ct. 1306, 10 L.Ed.2d 416 (1962), and some cases from other Circuits have said that Section 1001 does not to apply to in-court statements. Courts have largely relied on the fact that perjury statutes cover in-court statements, and have stated that the conventions of courtroom advocacy might create many ambiguous, borderline cases in which application of § 1001 could harm other important interests, such as rights of the criminal defendant. *See, e.g., United States v. Erhardt*, 381 F.2d 173 (6th Cir.1967); *United States v. Abrahams*, 604 F.2d 386 (5th Cir.1979).

**7.** North's written false statements would not fit in the perjury statute's stricter standards. False statements may be written or oral, they need not be taken under oath, and there is no rule necessitating witnesses. *See, United States v. Massey*, 550 F.2d 300, 305 (5th Cir.1977); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.1974); *United States v. Ratner*, 464 F.2d 101 (9th Cir. 1972).