# HUBBARD *v.* UNITED STATES

No. 94–172.   Argued February 21, 1995—Decided May 15, 1995

STEVENS, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III, and VI, in which SCALIA, KENNEDY, THOMAS, GINSBURG, and BREYER, JJ., joined, and an opinion with respect to Parts IV and V, in which GINSBURG and BREYER, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, in which KENNEDY, J., joined, *post*, p. 716. REHNQUIST, C. J., filed a dissenting opinion, in which O'CONNOR and SOUTER, JJ., joined, *post*, p. 718.

*Paul Morris* argued the cause for petitioner. With him on the brief was *Andrew Boros.*

*Richard P. Bress* argued the cause for the United States. With him on the brief were *Solicitor General Days, Assistant Attorney General Harris, Deputy Solicitor General Dreeben,* and *Joel M. Gershowitz.*

JUSTICE STEVENS delivered the opinion of the Court, except as to Parts IV and V.*

In unsworn papers filed in a bankruptcy proceeding, petitioner made three false statements of fact. Each of those misrepresentations provided the basis for a criminal conviction and prison sentence under the federal false statement statute, 18 U. S. C. § 1001. The question we address is whether § 1001 applies to false statements made in judicial proceedings.

I

In 1985, petitioner filed a voluntary petition for bankruptcy under Chapter 7 of the Bankruptcy Code. In the course of the proceedings, the trustee filed an amended complaint and a motion to compel petitioner to surrender certain business records. Petitioner opposed the relief sought by the trustee in a pair of unsworn, written responses filed with the Bankruptcy Court. Both of his responses contained falsehoods. Petitioner's answer to the trustee's complaint falsely denied the trustee's allegations that a well-drilling machine and parts for the machine were stored at petition-

---

*JUSTICE THOMAS joins Parts I, II, III, and VI of this opinion.

er's home and in a nearby warehouse. Petitioner's response to the trustee's discovery motion incorrectly stated that petitioner had already turned over all of the requested records.

When the misrepresentations came to light, petitioner was charged with three counts of making false statements under 18 U. S. C. § 1001.[1] That statute provides:

> "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 · or imprisoned not more than five years, or both."

Relying on our decision in *United States* v. *Bramblett*, 348 U. S. 503 (1955), the District Court instructed the jury that a bankruptcy court is a "department . . . of the United States" within the meaning of § 1001. The jury convicted petitioner on all three § 1001 counts, and the District Court sentenced him to concurrent terms of 24 months' imprisonment.

On appeal to the Court of Appeals for the Sixth Circuit, petitioner argued that his convictions under § 1001 were barred by the so-called "judicial function" exception. First suggested over 30 years ago in *Morgan* v. *United States*, 309 F. 2d 234 (CADC 1962), cert. denied, 373 U. S. 917 (1963), this doctrine limits the extent to which § 1001 reaches conduct occurring in the federal courts. Under the exception, only those misrepresentations falling within a court's "administrative" or "housekeeping" functions can give rise to liability

---

[1] Petitioner was also charged with, and convicted of, bankruptcy fraud and mail fraud under 18 U. S. C. §§ 152 and 1341 (1988 ed. and Supp. V). The validity of those convictions is not before us.

under § 1001; false statements made while a court is performing its adjudicative functions are not covered.

The Court of Appeals affirmed petitioner's convictions under § 1001. Although the judicial function exception has become entrenched over the years in a number of Circuits, the Sixth Circuit concluded, over a dissent, that the exception does not exist. 16 F. 3d 694 (1994). That conclusion created a split in the Circuits, prompting us to grant certiorari.[2] 513 U. S. 959 (1994). We now reverse.

## II

Section 1001 criminalizes false statements and similar misconduct occurring "in any matter within the jurisdiction of any department or agency of the United States." In ordinary parlance, federal courts are not described as "departments" or "agencies" of the Government. As noted by the Sixth Circuit, it would be strange indeed to refer to a court as an "agency." See 16 F. 3d, at 698, n. 4 ("[T]he U. S. Court of Appeals [is not] the Appellate Adjudication Agency"). And while we have occasionally spoken of the three branches of our Government, including the Judiciary, as "department[s]," e. g., *Mississippi* v. *Johnson*, 4 Wall. 475, 500 (1867), that locution is not an ordinary one. Far more common is the use of "department" to refer to a component of the Executive Branch.

---

[2] The judicial function exception has been recognized in the following cases: *United States* v. *Masterpol*, 940 F. 2d 760, 764–766 (CA2 1991); *United States* v. *Holmes*, 840 F. 2d 246, 248 (CA4), cert. denied, 488 U. S. 831 (1988); *United States* v. *Abrahams*, 604 F. 2d 386, 393 (CA5 1979); *United States* v. *Mayer*, 775 F. 2d 1387, 1390 (CA9 1985) *(per curiam)*; *United States* v. *Wood*, 6 F. 3d 692, 694–695 (CA10 1993). Although the Seventh and District of Columbia Circuits have questioned the basis of the exception, see *United States* v. *Barber*, 881 F. 2d 345, 350 (CA7 1989), cert. denied, 495 U. S. 922 (1990); *United States* v. *Poindexter*, 951 F. 2d 369, 387 (CADC 1991), cert. denied, 506 U. S. 1021 (1992), the Sixth Circuit stands alone in unambiguously rejecting it.

As an initial matter, therefore, one might be tempted to conclude that § 1001 does not apply to falsehoods made during federal-court proceedings. This commonsense reading is bolstered by the statutory definitions of "department" and "agency" set forth at 18 U. S. C. § 6. First adopted in 1948, and applicable to all of Title 18, the definitions create a presumption in favor of the ordinary meaning of the terms at issue:

> "The term 'department' means one of the executive departments enumerated in section 1 [now § 101] of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government.
>
> "The term 'agency' includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense."

Under § 6, it seems incontrovertible that "agency" does not refer to a court.[3] "Department," on the other hand, might be interpreted under § 6 to describe the Judicial Branch, but only if the "context" of § 1001 "shows" that Congress intended the word to be used in the unusual sense employed in *Mississippi* v. *Johnson.* We believe that § 6 permits such an interpretation only if the context in § 1001 is fairly powerful. "Shows" is a strong word; among its definitions is "[t]o make apparent or clear by evidence, testimony or reasoning; to prove; demonstrate." Webster's New International Dictionary 2324 (2d ed. 1949). Cf. *Rowland* v. *California Men's Colony, Unit II Men's Advisory Council,* 506 U.S. 194, 200–201 (1993) (discussing similar provision

---

[3] We express no opinion as to whether any other entity within the Judicial Branch might be an "agency" within the meaning of § 6.

requiring adherence to presumptive definition unless context "indicate[d]" a different meaning).[4]

In *Rowland*, we explained the proper method of analyzing a statutory term's "context" to determine when a presumptive definition must yield. Such an analysis, we explained, requires a court to examine "the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts . . . ." *Id.*, at 199; see also *id.*, at 212–213 (THOMAS, J., dissenting); *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 689–690, n. 53 (1978). Review of other materials is not warranted. "If Congress had meant to point further afield, as to legislative history, for example, it would have been natural to use a more spacious phrase, like 'evidence of congressional intent,' in place of 'context.'" *Rowland*, 506 U. S., at 200.

In the case of § 1001, there is nothing in the text of the statute, or in any related legislation, that even suggests—let alone "shows"—that the normal definition of "department" was not intended. Accordingly, a straightforward interpretation of the text of § 1001, with special emphasis on the words "department or agency," would seem to lead inexorably to the conclusion that there is no need for any judicial function exception because the reach of the statute simply does not extend to courts. Our task, however, is complicated by the fact that the Court interpreted "department" broadly 40 years ago in *Bramblett*. We must, therefore,

---

[4] Congress' use of the word "shows" is unsurprising in view of the fact that 18 U. S. C. § 6 provides statutory definitions exclusively for criminal statutes. We have often emphasized the need for clarity in the definition of criminal statutes, to provide "fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931). See also *United States* v. *Batchelder*, 442 U. S. 114, 123 (1979); *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453 (1939). Adhering to the statutory definition of a particular term is fully consistent with this objective. Cf. *Rowland*, 506 U. S., at 199 (construing 1 U. S. C. § 1, which is generally applicable to any Act of Congress).

turn our attention to that case before deciding the fate of the judicial function exception.

## III

Defendant Bramblett was a former Member of Congress who had falsely represented to the Disbursing Office of the House of Representatives that a particular person was entitled to compensation as his official clerk. He argued that he could not be convicted under § 1001 because his falsehood was directed to an office within the Legislative Branch. 348 U. S., at 504. The Court rejected this argument, concluding that the word "department," as used in § 1001, "was meant to describe the executive, legislative and judicial branches of the Government." *Id.*, at 509. Although *Bramblett* involved Congress, not the courts, the text and reasoning in the Court's opinion amalgamated all three branches of the Government. Thus, *Bramblett* is highly relevant here even though its narrow holding only extended § 1001 to false statements made within the Legislative Branch.

We think *Bramblett* must be acknowledged as a seriously flawed decision. Significantly, the *Bramblett* Court made no attempt to reconcile its interpretation with the usual meaning of "department." It relied instead on a review of the evolution of § 1001 and its statutory cousin, the false claims statute presently codified at 18 U. S. C. § 287, as providing a "context" for the conclusion that "Congress could not have intended to leave frauds such as [Bramblett's] without penalty." 348 U. S., at 509. We are convinced that the Court erred by giving insufficient weight to the plain language of §§ 6 and 1001.[5] Although the historical evolution of a stat-

---

[5] In addition, it is debatable at best whether the Court was correct in asserting that, but for its expansive interpretation of § 1001, Bramblett's fraud would necessarily have gone unpunished. In discussing the evolution of § 1001, the Court noted that the false claims statute, originally enacted in 1863 and by 1955 codified at 18 U. S. C. § 287, "clearly covers the presentation of false claims against any component of the Government

ute—based on decisions by the entire Congress—should not be discounted for the reasons that may undermine confidence in the significance of excerpts from congressional debates and committee reports,[6] a historical analysis normally provides less guidance to a statute's meaning than its final text. In the ordinary case, absent any "indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it." *BFP* v. *Resolution Trust Corporation*, 511 U. S. 531, 570 (1994) (SOUTER, J., dissenting).

As noted above, a straightforward reading of the statute suggests a meaning of "department" that is fully consistent with the definition set forth in § 6. See *supra*, at 699–702. Similarly unremarkable is the language of the original Act of Congress adopting what is now § 1001. That piece of legislation—the Act of June 18, 1934, 48 Stat. 996 (1934 Act)—

---

to any officer of the Government." *United States* v. *Bramblett*, 348 U. S. 503, 505 (1955). In an earlier decision, it had interpreted "claim" in the false claims statute broadly, explaining that the word referred to "a claim for money or property to which a right is asserted against the Government, based upon the Government's own liability to the claimant." *United States* v. *Cohn*, 270 U. S. 339, 345–346 (1926). Bramblett could thus seemingly have been charged with violating § 287, or at least aiding and abetting in a violation of that statute, since his misrepresentation was intended to procure Government compensation. See Supplemental Memorandum for the United States in *United States* v. *Bramblett*, O. T. 1954, No. 159 (arguing that Bramblett's conviction could be affirmed because his conduct violated all the elements of § 287). In today's decision, we do not disturb the scope of § 287 as construed in either *Cohn* or *Bramblett*.

Bramblett's fraud also was arguably directed at an "agency" within the meaning of § 1001. The Court recognized this contention, noting "it might be argued, as the Government does, that the [Disbursing Office] is an 'authority' within the § 6 definition of 'agency.'" 348 U. S., at 509. The Court refused, however, to rest its decision on that more narrow interpretation. *Ibid.*

[6] See, *e. g., Thompson* v. *Thompson*, 484 U. S. 174, 191–192 (1988) (SCALIA, J., concurring in judgment); but cf. Breyer, On the Uses of Legislative History in Interpreting Statutes, 65 S. Cal. L. Rev. 845 (1992).

amended what was then § 35 of the Criminal Code to provide, in pertinent part:

> "[W]hoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, *in any matter within the jurisdiction of any department or agency of the United States* or of any corporation in which the United States of America is a stockholder . . . [shall be punished]." (Emphasis added.)

This language conveys no different message regarding "department" than the current version of § 1001.

What, then, of the earlier statutory history chronicled in *Bramblett?* We believe it is at best inconclusive, and that it does not supply a "context" sufficiently clear to warrant departure from the presumptive definition in 18 U. S. C. § 6.

The earliest statutory progenitor of § 1001 was the original false claims statute, adopted as the Act of Mar. 2, 1863, ch. 67, 12 Stat. 696 (1863 Act). That enactment made it a criminal offense for any person, whether a civilian or a member of the military services, to

> "present or cause to be presented for payment or approval to or by any person or officer in the civil or military service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent." [7]

---

[7] In *Bramblett,* the Court incorrectly stated that the 1863 Act only penalized misconduct by members of the military. In fact, § 3 of the Act established criminal and civil penalties for false claims and other misdeeds

The 1863 Act also proscribed false statements, but the scope of that provision was far narrower than that of modern-day § 1001; the Act prohibited only those false statements made "for the purpose of obtaining, or aiding in obtaining, the approval or payment of [a false] claim." 12 Stat. 696. The Court explained in *Bramblett* that the false claims provision in the 1863 Act "clearly cover[ed] the presentation of false claims against any component of the Government to any officer of the Government," 348 U. S., at 505, and it asserted similar breadth for the false statement portion of the Act, *ibid.*

The false statements provision in the 1863 Act remained essentially unchanged for 55 years.[8] In 1918, Congress amended the statute to provide as follows:

> "[W]hoever, for the purpose of obtaining or aiding to obtain the payment or approval of [a false] claim, *or for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations,* or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry [shall be punished]." Act of Oct. 23,

---

committed by "any person not in the military or naval forces of the United States." 12 Stat. 698.

[8] In 1873, the statute was codified and minor changes were made. See Rev. Stat. § 5438. The penalties were changed in the Act of May 30, 1908, 35 Stat. 555, and the statute was recodified as § 35 of the Criminal Code in the Act of Mar. 4, 1909, 35 Stat. 1095.

1918, ch. 194, 40 Stat. 1015–1016 (1918 Act) (emphasis added).

The scope of this new provision is unclear. Although it could be read to create criminal liability for government-wide false statements, its principal purpose seems to have been to prohibit false statements made to defraud Government corporations, which flourished during World War I. Cf. *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 386–391 (1995) (tracing history of Government corporations). In one important respect, moreover, the statute remained relatively narrow: It was limited to false statements intended to bilk the Government out of money or property. See *United States* v. *Cohn*, 270 U. S. 339 (1926). Given the continuing focus on financial frauds against the Government, the 1918 Act did not alter the fundamental character of the original false claims statute.

The 1934 Act, which created the statute we now know as § 1001, did work such a change. Congress excised from the statute the references to financial frauds, thereby severing the historical link with the false claims portion of the statute, and inserted the requirement that the false statement be made "in any matter within the jurisdiction of any department or agency of the United States." This addition, critical for present purposes, is subject to two competing inferences. On one hand, it can be read to impose new words of limitation—whose ordinary meaning connotes the Executive Branch—in an altogether reformulated statute. On the other hand, it can be viewed as stripping away the financial fraud requirement while not disturbing the pre-existing breadth the statute had enjoyed from its association with the false claims statute.

The *Bramblett* Court embraced the latter inference, finding no indication in any legislative history that the amendment was intended to narrow the scope of the statute. We think this interpretation, though not completely implausible, is nevertheless unsound. The differences between the 1934

Act and its predecessors are too dramatic to evidence a congressional intent to carry forward any features of the old provision. Moreover, our comments, over the years, regarding the 1934 legislation—including those contained in *Bramblett* itself—contradict the notion that such a "carry forward" occurred.

We have repeatedly recognized that the 1934 Act was passed at the behest of "the Secretary of the Interior to aid the enforcement of laws relating to the functions of the Department of the Interior and, in particular, to the enforcement of regulations . . . with respect to the transportation of 'hot oil.'" *United States* v. *Gilliland,* 312 U. S. 86, 93–94 (1941); see also *United States* v. *Yermian,* 468 U. S. 63, 72 (1984) (the 1934 Act was "needed to increase the protection of federal agencies from the variety of deceptive practices plaguing the New Deal administration"); *id.,* at 80 (REHNQUIST, J., dissenting) (the statute was prompted by problems arising from "the advent of the New Deal programs in the 1930's"). Indeed, the *Bramblett* Court itself acknowledged the connection between the 1934 Act and the proliferation of fraud in the newly formed Executive agencies:

> "The 1934 revision was largely the product of the urging of the Secretary of the Interior. The Senate Report, S. Rep. No. 1202, 73d Cong., 2d Sess., indicates that its purpose was to broaden the statute so as to reach not only false papers presented in connection with a claim against the Government, but also nonmonetary frauds such as those involved in the 'hot-oil' shipments." 348 U. S., at 507.

None of our opinions refers to any indication that Congress even *considered* whether the 1934 Act might apply outside the Executive Branch, much less that it affirmatively understood the new enactment to create broad liability for falsehoods in the federal courts. In light of this vacuum, it would be curious indeed if Congress truly intended the 1934 Act to

work a dramatic alteration in the law governing misconduct in the court system or the Legislature. The unlikelihood of such a scenario only strengthens our conclusion that the *Bramblett* Court erred in its interpretation of § 1001's statutory history.

Putting *Bramblett*'s historical misapprehensions to one side, however, we believe the *Bramblett* Court committed a far more basic error in its underlying approach to statutory construction. Courts should not rely on inconclusive statutory history as a basis for refusing to give effect to the plain language of an Act of Congress, particularly when the Legislature has specifically defined the controverted term. In *Bramblett*, the Court's method of analysis resulted in a decision that is at war with the text of not one, but two different Acts of Congress.

Whether the doctrine of *stare decisis* nevertheless requires that we accept *Bramblett*'s erroneous interpretation of § 1001 is a question best answered after reviewing the body of law directly at issue: the decisions adopting the judicial function exception.

### IV

Although other federal courts have refrained from directly criticizing *Bramblett*'s approach to statutory construction, it is fair to say that they have greeted the decision with something less than a warm embrace. The judicial function exception, an obvious attempt to impose limits on *Bramblett*'s expansive reading of § 1001, is a prime example. As the following discussion indicates, the judicial function exception is almost as deeply rooted as *Bramblett* itself.

The seeds of the exception were planted by the Court of Appeals for the District of Columbia Circuit only seven years after *Bramblett* was decided. In *Morgan* v. *United States*, 309 F. 2d 234 (1962), cert. denied, 373 U. S. 917 (1963), the defendant, who had falsely held himself out to be a bona fide member of the bar, was prosecuted on three counts of violating § 1001 for concealing from the court his name, identity,

and nonadmission to the bar. After first acknowledging that, but for *Bramblett*, it might well have accepted the argument that Congress did not intend § 1001 to apply to the courts, the Court of Appeals upheld the conviction. But the court was clearly troubled by the potential sweep of § 1001. Noting that the statute prohibits "concealment" and "covering up" of material facts, as well as intentional falsehoods, the court wondered whether the statute might be interpreted to criminalize conduct that falls well within the bounds of responsible advocacy.[9] The court concluded its opinion with this significant comment:

> "We are certain that neither Congress nor the Supreme Court intended the statute to include traditional trial tactics within the statutory terms 'conceals or covers up.' We hold only, on the authority of the Supreme Court construction, that the statute does apply to the type of action with which appellant was charged, action which essentially involved the 'administrative' or 'housekeeping' functions, not the 'judicial' machinery of the court." 309 F. 2d, at 237.

Relying on *Morgan*, the Court of Appeals for the Sixth Circuit reversed a conviction several years later "because § 1001 does not apply to the introduction of false documents as evidence in a criminal proceeding." *United States* v. *Erhardt*, 381 F. 2d 173, 175 (1967) *(per curiam)*. The court explained that the judicial function exception suggested in *Morgan* was necessary to prevent the perjury statute, with its two-witness rule (since repealed), from being undermined. 381 F. 2d, at 175.

---

[9] " 'Does a defendant "cover up . . . a material fact" when he pleads not guilty?' 'Does an attorney "cover up" when he moves to exclude hearsay testimony he knows to be true, or when he makes a summation on behalf of a client he knows to be guilty?' " *Morgan* v. *United States*, 309 F. 2d 234, 237 (CADC 1962), cert. denied, 373 U. S. 917 (1963).

Once planted, the judicial function exception began to flower in a number of other Circuits. The Ninth Circuit summarized the state of the law in 1985:

"[T]he adjudicative functions exception to section 1001 has been suggested or recognized by appellate decisions since 1962, not long after the Supreme Court decided that section 1001 applies to matters within the jurisdiction of the judicial branch. In these twenty-three years, there has been no response on the part of Congress either repudiating the limitation or refining it. It therefore seems too late in the day to hold that no exception exists." *United States* v. *Mayer*, 775 F. 2d 1387, 1390 *(per curiam)* (footnote omitted).

The Second Circuit sounded a similar theme in 1991, relying in part on the congressional acquiescence to which the Ninth Circuit had adverted in *Mayer*. The Second Circuit wrote:

"No court, to our knowledge, whether due to its acceptance of the exception or to prosecutorial reticence, has ever sustained a section 1001 conviction for false statements made by a defendant to a court acting in its judicial capacity. The exception was first articulated nearly thirty years ago and '. . . [i]t therefore seems too late in the day to hold that no exception exists.' *Mayer*, 775 F. 2d at 1390." *United States* v. *Masterpol*, 940 F. 2d 760, 766.[10]

---

[10] Some 17 years before *Masterpol*, the Second Circuit restricted the application of § 1001 in a slightly different manner. In *United States* v. *D'Amato*, 507 F. 2d 26 (1974), the court overturned a § 1001 conviction arising out of a false affidavit submitted in the course of a private civil lawsuit. Based upon a review of relevant case law and legislative history, the court concluded that § 1001 did not apply "where the Government is involved only by way of a court deciding a matter in which the Government or its agencies are not involved." *Id.*, at 28. Accord, *United States* v. *London*, 714 F. 2d 1558, 1561–1562 (CA11 1983).

Although not all of the courts of appeals have endorsed the judicial function exception, it is nevertheless clear that the doctrine has a substantial following. See n. 2, *supra*. Moreover, as both the Ninth and the Second Circuits observed, Congress has not seen fit to repudiate, limit, or refine the exception despite its somewhat murky borders and its obvious tension with the text of the statute as construed in *Bramblett*. On the other hand, it is also true that Congress has not seen fit to overturn the holding in *Bramblett*, despite the fact that the opinions endorsing the judicial function exception evidence a good deal of respectful skepticism about the correctness of that decision.

## V

With the foregoing considerations in mind, we now turn to the difficult *stare decisis* question that this case presents. It is, of course, wise judicial policy to adhere to rules announced in earlier cases. As Justice Cardozo reminded us: "The labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him." B. Cardozo, The Nature of the Judicial Process 149 (1921). Adherence to precedent also serves an indispensable institutional role within the Federal Judiciary. *Stare decisis* is "a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion.'" *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172 (1989) (quoting The Federalist No. 78, p. 490 (H. Lodge ed. 1888) (A. Hamilton)). See also *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 854–855 (1992) (joint opinion of O'CONNOR, KENNEDY, and SOUTER, JJ.). Respect for precedent is strongest "in the area of statutory construction, where Congress is free to change this Court's interpretation

of its legislation." *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720, 736 (1977).[11]

In this case, these considerations point in two conflicting directions. On one hand, they counsel adherence to the construction of § 1001 adopted in *Bramblett;* on the other, they argue in favor of retaining the body of law that has cut back on the breadth of *Bramblett* in Circuits from coast to coast.

It would be difficult to achieve both goals simultaneously. For if the word "department" encompasses the Judiciary, as *Bramblett* stated, 348 U. S., at 509, the judicial function exception cannot be squared with the text of the statute. A court is a court—and is part of the Judicial Branch—whether it is functioning in a housekeeping or judicial capacity. Conversely, *Bramblett* could not stand if we preserved the thrust of the judicial function exception—*i. e.*, if we interpreted 18 U. S. C. § 1001 so that it did not reach conduct occurring in federal-court proceedings. Again, although *Bramblett* involved a false representation to an office within the Legislative Branch, the decision lumped all three branches together in one and the same breath. See 384 U. S., at 509 ("department" in § 1001 "was meant to describe the executive, legislative and judicial branches of the Government").

---

[11] See also, *e. g., Patterson* v. *McLean Credit Union*, 491 U. S., at 172–173 (*stare decisis* has "special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done"); *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U. S. 409, 424 (1986) (noting "the strong presumption of continued validity that adheres in the judicial interpretation of a statute"); *Runyon* v. *McCrary*, 427 U. S. 160, 189 (1976) (STEVENS, J., concurring) (declining to overturn "a line of [statutory] authority which I firmly believe to have been incorrectly decided"); *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting) ("*Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. This is commonly true, even where the error is a matter of serious concern, provided correction can be had by legislation") (citation omitted).

We think the text of § 1001 forecloses any argument that we should simply ratify the body of cases adopting the judicial function exception. We are, however, persuaded that the clarity of that text justifies a reconsideration of *Bramblett*.[12] Although such a reconsideration is appropriate only in the rarest circumstances, we believe this case permits it because of a highly unusual "intervening development of the law," see *Patterson*, 491 U. S., at 173, and because of the absence of significant reliance interests in adhering to *Bramblett*.

The "intervening development" is, of course, the judicial function exception. In a virtually unbroken line of cases, respected federal judges have interpreted § 1001 so narrowly that it has had only a limited application within the Judicial Branch. See nn. 2 and 10, *supra*. This interpretation has roots both deep and broad in the lower courts. Although the judicial function exception has not been adopted by this Court, our review of *Bramblett* supports the conclusion that the cases endorsing the exception almost certainly reflect the intent of Congress. It is thus fair to characterize the judicial function exception as a "competing legal doctrin[e]," *Patterson*, 491 U. S., at 173, that can lay a legitimate claim to respect as a settled body of law. Overruling *Bramblett* would preserve the essence of this doctrine and would, to that extent, promote stability in the law.[13]

---

[12] Because the fate of the judicial function exception is tied so closely to *Bramblett*, we find no merit in the Government's suggestion that a reconsideration of the validity of that decision is not fairly included in the question on which we granted certiorari. See generally *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 379–383 (1995).

[13] The dissent criticizes us for according respect to a body of law developed in the lower courts, arguing that our decision will "induce" federal judges on the courts of appeals to "ignore" precedents from this Court and thereby invite chaos in the judicial system. *Post*, at 721. We would have thought it self-evident that the lower courts must adhere to our precedents. Indeed, the dissent's dire prediction is at odds with its own observation that "no lower court would deliberately refuse to follow the decision

*Stare decisis* has special force when legislators or citizens "have acted in reliance on a previous decision, for in this instance overruling the decision would dislodge settled rights and expectations or require an extensive legislative response." *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 202 (1991); see also *Casey*, 505 U. S., at 854–856 (joint opinion of O'CONNOR, KENNEDY, and SOUTER, JJ.). Here, however, the reliance interests at stake in adhering to *Bramblett* are notably modest. In view of the extensive array of statutes that already exist to penalize false statements within the Judicial Branch, see, *e. g.*, 18 U. S. C. § 1621 (perjury); § 1623 (false declarations before grand jury or court); § 1503 (obstruction of justice); § 287 (false claims against the United States), we doubt that prosecutors have relied on § 1001 as an important means of deterring and punishing litigation-related misconduct.[14] But we need not speculate, for we have direct evidence on this point. The United States Attorneys' Manual states quite plainly that "[p]rosecutions should not be brought under 18 U. S. C. § 1001 for false statements submitted in federal court proceedings"; it instead directs prosecutors to proceed under the perjury or obstruction of justice statutes. U. S. Dept. of

---

of a higher court," see *post*, at 720. In concluding that the cases adopting the judicial function exception are faithful to the intent of the Legislature that adopted § 1001, we have obviously exercised our own independent judgment. Thus, far from "subvert[ing] the very principle on which a hierarchical court system is built," *post*, at 719, our decision merely reflects our assessment of the statutory construction issue this case presents, while serving what the dissent acknowledges to be one of the central purposes of *stare decisis:* promoting "stability and certainty in the law," *post*, at 720.

[14] The perjury and false claims statutes also cover the Legislative Branch, as does 18 U. S. C. § 1505 (obstruction of justice). The existence of overlaps with other statutes does not itself militate in favor of overruling *Bramblett;* Congress may, and often does, enact separate criminal statutes that may, in practice, cover some of the same conduct. See *United States* v. *Batchelder*, 442 U. S., at 123–124; *United States* v. *Gilliland*, 312 U. S. 86, 95 (1941). The overlaps here simply demonstrate that prosecutors cannot be said to have any significant reliance interest in *Bramblett*.

Justice, United States Attorneys' Manual ¶ 9–69.267 (1992). Clearer evidence of nonreliance can scarcely be imagined.[15]

Similarly unimpressive is the notion of congressional reliance on *Bramblett*. The longstanding judicial function exception has, to a large extent, negated the actual application of § 1001 within the Judiciary. It is unlikely that Congress has relied on what has, for many years, been an unfulfilled promise.

In sum, although the *stare decisis* issue in this case is difficult, we conclude that there are sound reasons to correct *Bramblett*'s erroneous construction of § 1001. Although we could respect prior decisions by endorsing the judicial function exception or by adhering to *Bramblett* while repudiating that exception, we believe coherence and stability in the law will best be served in this case by taking a different course. Limiting the coverage of § 1001 to the area plainly marked by its text will, as a practical matter, preserve the interpretation of § 1001 that has prevailed for over 30 years and will best serve the administration of justice in the future.

## VI

*Bramblett* is hereby overruled. We hold that a federal court is neither a "department" nor an "agency" within the meaning of § 1001. The Court of Appeals' decision is therefore reversed to the extent that it upheld petitioner's convictions under § 1001.

*It is so ordered.*

---

[15] The absence of significant reliance interests is confirmed by an examination of statistical data regarding actual cases brought under § 1001. The Government has secured convictions under § 1001 in 2,247 cases over the last five fiscal years, see *post*, at 722, but the dissent can identify only five reported § 1001 cases in that time period brought in connection with false statements made to the Judiciary and Legislature. *Post*, at 723, n. (At least two of the five were unsuccessful, from the Government's point of view.) This tiny handful of prosecutions does not, in our view, evidence a weighty reliance interest on the part of prosecutors in adhering to the interpretation of § 1001 set forth in *Bramblett*.

JUSTICE SCALIA, with whom JUSTICE KENNEDY joins, concurring in part and concurring in the judgment.

I concur in the judgment of the Court, and join Parts I–III and VI of JUSTICE STEVENS' opinion. *United States* v. *Bramblett*, 348 U. S. 503 (1955), should be overruled.

The doctrine of *stare decisis* protects the legitimate expectations of those who live under the law, and, as Alexander Hamilton observed, is one of the means by which exercise of "an arbitrary discretion in the courts" is restrained, The Federalist No. 78, p. 471 (C. Rossiter ed. 1961). Who ignores it must give reasons, and reasons that go beyond mere demonstration that the overruled opinion was wrong (otherwise the doctrine would be no doctrine at all).

The reason here, as far as I am concerned, is the demonstration, over time, that *Bramblett* has unacceptable consequences, which can be judicially avoided (absent overruling) only by limiting *Bramblett* in a manner that is irrational or by importing exceptions with no basis in law. Unlike JUSTICE STEVENS, I do not regard the Courts of Appeals' attempts to limit *Bramblett* as an "'intervening development of the law,'" *ante*, at 713 (quoting *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 173 (1989)), that puts us to a choice between two conflicting lines of authority. Such "intervening developments" by lower courts that we do not agree with are ordinarily disposed of by reversal. See, *e. g.*, *McNally* v. *United States*, 483 U. S. 350 (1987). Instead, the significance I find in the fact that so many Courts of Appeals have strained so mightily to discern an exception that the statute does not contain, see *ante*, at 699, n. 2 (collecting cases), is that it demonstrates how great a potential for mischief federal judges have discovered in the mistaken reading of 18 U. S. C. § 1001, a potential we did not fully appreciate when *Bramblett* was decided. To be sure, since 18 U. S. C. § 1001's prohibition of concealment is violated only when

there exists a duty to disclose, see, *e. g.*, *United States* v. *Kingston*, 971 F. 2d 481, 489 (CA10 1992); *United States* v. *Richeson*, 825 F. 2d 17, 20 (CA4 1987); *United States* v. *Irwin*, 654 F. 2d 671, 678–679 (CA10 1981), cert. denied, 455 U. S. 1016 (1982), it does not actually prohibit any legitimate trial tactic. There remains, however, a serious concern that the *threat* of criminal prosecution under the capacious provisions of § 1001 will deter vigorous representation of opposing interests in adversarial litigation, particularly representation of criminal defendants, whose adversaries control the machinery of § 1001 prosecution.

One could avoid the problem by accepting the Courts of Appeals' invention of a "judicial function" exception, but there is simply no basis in the text of the statute for that. Similarly unprincipled would be rejecting *Bramblett*'s dictum that § 1001 applies to the courts, while adhering to *Bramblett*'s holding that § 1001 applies to Congress. This would construct a bizarre regime in which "department" means the Executive and Legislative Branches, but not the Judicial, thereby contradicting not only the statute's intent (as *Bramblett* does), but, in addition, all conceivable interpretations of the English language. Neither of these solutions furthers the goal of avoiding "an arbitrary discretion in the courts"; they seem to me much more arbitrary than simply overruling a wrongly decided case.

The other goal of *stare decisis*, preserving justifiable expectations, is not much at risk here. Those whose reliance on *Bramblett* induced them to tell the truth to Congress or the courts, instead of lying, have no claim on our solicitude. Some convictions obtained under *Bramblett* may have to be overturned, and in a few instances wrongdoers may go free who could have been prosecuted and convicted under a different statute if *Bramblett* had not been assumed to be the law. I count that a small price to pay for the uprooting of this weed.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CON-NOR and JUSTICE SOUTER join, dissenting.

The bankruptcy trustee objected to the discharge of petitioner, a voluntary bankrupt, believing that he had filed false information. The trustee filed a complaint under 11 U. S. C. § 727, alleging petitioner stored a well-drilling machine at his residence; petitioner answered by denying the allegation "for the reason that it is untrue." App. 12, ¶ 10. The trustee also alleged in a separate motion that petitioner had, despite requests, failed to turn over all the books and records relating to the bankruptcy estate. Petitioner filed a response denying the allegation, and asserting that he had produced the requested documents at the behest of a previous trustee. Petitioner was then indicted under 18 U. S. C. § 1001, and a jury found that each of these responses was a lie.

Today, the majority jettisons a 40-year-old unanimous decision of this Court, *United States* v. *Bramblett,* 348 U. S. 503 (1955), under which petitioner's conviction plainly would have been upheld. It does so despite an admission that the Court's reading of § 1001 in *Bramblett* was "not completely implausible," *ante,* at 706. In replacing *Bramblett's* plausible, albeit arguably flawed, interpretation of the statute with its own "sound" reading, the Court disrespects the traditionally stringent adherence to *stare decisis* in statutory decisions. *Patterson* v. *McLean Credit Union,* 491 U. S. 164, 172 (1989); *Illinois Brick Co.* v. *Illinois,* 431 U. S. 720, 736 (1977). The two reasons offered by the plurality in Part V of the opinion and the justification offered by the concurring opinion fall far short of the institutional hurdle erected by our past practice against overruling a decision of this Court interpreting an Act of Congress.

The first reason is styled as an "intervening development in the law"; under it, decisions of Courts of Appeals that cannot be reconciled with our earlier precedent are treated as a basis for disavowing, not the aberrant Court of Appeals deci-

sions, but, *mirabile dictu* our own decision! This novel corollary to the principle of *stare decisis* subverts the very principle on which a hierarchical court system is built. The second reason given is that there has been little or no reliance on our *Bramblett* decision; I believe that this ground is quite debatable, if not actually erroneous.

Today's decision harkens to the important reason behind the doctrine of *stare decisis*, but does not heed it. That doctrine is "a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion.'" *Patterson, supra,* at 172, citing The Federalist No. 78, p. 490 (H. Lodge ed. 1888) (A. Hamilton). Respect for precedent is strongest "in the area of statutory construction, where Congress is free to change this Court's interpretation of its legislation." *Illinois Brick Co., supra,* at 736. Justice Brandeis' dissenting opinion in *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393 (1932), made the point this way:

> "*Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation." *Id.,* at 406 (citations omitted).

We have recognized a very limited exception to this principle for what had been called "intervening developments in the law." But the cases exemplifying this principle, *e. g., Andrews* v. *Louisville & Nashville R. Co.,* 406 U. S. 320 (1972); *Rodriguez de Quijas* v. *Shearson/American Express, Inc.,* 490 U. S. 477 (1989), have invariably made clear that the "intervening developments" were in the case law of this Court, not of the lower federal courts. Indeed, in *Illinois Brick Co.,* we refused to follow a line of lower court decisions

which had carved out an exception from one of our precedents. 431 U. S., at 743–744.

But today's decision departs radically from the previously limited reliance on this exception. The principle of *stare decisis* is designed to promote stability and certainty in the law. While most often invoked to justify a court's refusal to reconsider its own decisions, it applies *a fortiori* to enjoin lower courts to follow the decision of a higher court. This principle is so firmly established in our jurisprudence that no lower court would deliberately refuse to follow the decision of a higher court. But cases come in all shapes and varieties, and it is not always clear whether a precedent applies to a situation in which some of the facts are different from those in the decided case. Here lower courts must necessarily make judgments as to how far beyond its particular facts the higher court precedent extends.

If there is appeal as a matter of right from the lower court to the higher court, any decision by the lower court that is viewed as mistaken by the higher court will in the normal course of events be corrected in short order by reversal on appeal. But in the present day federal court system, where review by this Court is almost entirely discretionary, a different regime prevails. We receive nearly 7,000 petitions for certiorari every Term, and can grant only a tiny fraction of them. A high degree of selectivity is thereby enjoined upon us in exercising our certiorari jurisdiction, and our Rule 10 embodies the standards by which we decide to grant review. One of the reasons contained in Rule 10.1(a) is the existence of a conflict between one court of appeals and another. The negative implication of this ground, borne out time and again in our decisions to grant and deny certiorari, is that ordinarily a court of appeals decision interpreting one of our precedents—even one deemed to be arguably inconsistent with it—will not be reviewed unless it conflicts with a decision of another court of appeals. This fact is a necessary concomitant of the limited capacity in this Court.

One of the consequences of this highly selective standard for granting review is that this Court is deprived of a very important means of assuring that the courts of appeals adhere to its precedents. It is all the more important, therefore, that no actual inducements to ignore these precedents be offered to the courts of appeals. But today's decision is just such an inducement; it tells courts of appeals that if they build up a body of case law contrary to ours, their case law will serve as a basis for overruling our precedent. It is difficult to imagine a more topsy-turvy doctrine than this, or one more likely to unsettle established legal rules that the doctrine of *stare decisis* is designed to protect.

The plurality attempts to bolster this aspect of its opinion by blandly assuring us that "the cases endorsing the exception almost certainly reflect the intent of Congress." *Ante,* at 713. Members of Congress will surely be surprised by this statement. Congress has not amended or considered amending § 1001 in the 40 years since *Bramblett* was decided. We have often noted the danger in relying on congressional inaction in construing a statute, *Brecht* v. *Abrahamson,* 507 U. S. 619, 632 (1993), citing *Schneidewind* v. *ANR Pipeline Co.,* 485 U. S. 293, 306 (1988), but even there the "inaction" referred to is a failure of Congress to enact a particular proposal. Here there was not even any proposal before Congress.

If we delve more deeply into the hypothetical thought processes of a very diligent Member of Congress who made a specialty of following cases construing § 1001, the Member would undoubtedly know of our decision in *Bramblett* 40 years ago. If he also followed decisions of the courts of appeals, he would know that in various forms—whether a "judicial function" exception or an "exculpatory no" rule— several Courts of Appeals have held § 1001 inapplicable to some statements made in the course of judicial proceedings. If, after due deliberation, he concluded that this exception was inconsistent with our opinion in *Bramblett,* he would

surely also realize that in due course, on the assumption that the Judiciary was functioning as it should, the Supreme Court would itself decide that the exception was inconsistent with *Bramblett,* and disavow the exception. But of one thing he would have been in no doubt: that under *Bramblett* one who lied to an officer of Congress was punishable under § 1001, since that was the precise holding of *Bramblett.* But it is that very justifiable expectation of Congress that is set at naught by today's decision, under which the legislative process is no longer protected by § 1001.

The plurality offers a second reason in defense of its decision to overrule *Bramblett.* It points to a lack of significant reliance interests in *Bramblett.* It dispels any reliance prosecutors might have in enforcement of § 1001 by arguing that the Government has expressed a preference for proceeding under alternative statutes that punish comparable behavior. U. S. Dept. of Justice, United States Attorneys' Manual ¶ 9–69.267 (1992). The Government offered a convincing explanation for this preference: it instructs prosecutors to proceed under alternative statutes due to the uncertain mine field posed by the judicial function exception adopted in some, but not all, Circuits. Brief for Petitioner 20, and n. 9. I do not think the Government disclaims reliance by adopting a defensive litigating strategy in response to the choice of lower courts to disregard precedent favorable to the Government. And in this particular case, the perjury alternative in 18 U. S. C. § 1621 was altogether unavailable to punish petitioner's falsehoods because his statements were not verified, and the obstruction of justice alternative in 18 U. S. C. § 1503 was of dubious utility.

Statistics compiled by the Administrative Office of the United States Courts indicate that the Government has secured convictions under § 1001 in 2,247 cases over the last five fiscal years. Because the Administrative Office does not break down its statistics by type of agency to which the defendant made a false statement, further exploration of the

subject must be limited to published decisions. It is unclear what proportion of these cases involved false statements made to the Legislative or Judicial Branch, but it appears that the Government has attempted to proceed under § 1001 for false statements made to the Judiciary and Legislature with mixed success.* To the extent it has secured valid convictions in some courts in reliance on *Bramblett*, the Government should not now be forced to endure requests for habeas relief that will inevitably be filed in the wake of the Court's opinion.

The additional comments set forth in the concurring opinion equally disregard the respect due a unanimous decision rendered by six Justices who took the same oath of office sworn by the six Justices who overrule *Bramblett* today. The doctrine of *stare decisis* presumes to reinforce the notion that justice is dispensed according to law and not to serve

---

*For false statements made to Bankruptcy Courts, see *United States* v. *Taylor*, 907 F. 2d 801 (CA8 1990) (upheld dismissal under exculpatory no doctrine); *United States* v. *Rowland*, 789 F. 2d 1169 (CA5) (affirmed conviction), cert. denied, 479 U. S. 964 (1986). For false statements made to Article III courts, see *United States* v. *Masterpol*, 940 F. 2d 760 (CA2 1991) (reversed conviction); *United States* v. *Holmes*, 840 F. 2d 246 (CA4) (affirmed conviction), cert. denied, 488 U. S. 831 (1988); *United States* v. *Mayer*, 775 F. 2d 1387 (CA9 1985) (reversed conviction); *United States* v. *Powell*, 708 F. 2d 455 (CA9 1983) (affirmed conviction); *United States* v. *Abrahams*, 604 F. 2d 386 (CA5 1979) (reversed conviction); *United States* v. *D'Amato*, 507 F. 2d 26 (CA2 1974) (reversed conviction); *United States* v. *Erhardt*, 381 F. 2d 173 (CA6 1967) (reversed conviction); *United States* v. *Stephens*, 315 F. Supp. 1008 (WD Okla. 1970) (denied motion to dismiss; ultimate disposition unclear). For false statements made to the Legislative Branch, see *United States* v. *Poindexter*, 951 F. 2d 369 (CADC 1991) (remand to allow independent counsel to pursue § 1001 count), cert. denied, 506 U. S. 1021 (1992); *United States* v. *Hansen*, 772 F. 2d 940 (CADC 1985) (affirmed conviction), cert. denied, 475 U. S. 1045 (1986); *United States* v. *Diggs*, 613 F. 2d 988 (CADC 1979) (affirmed conviction), cert. denied, 446 U. S. 982 (1980); *United States* v. *Levine*, 860 F. Supp. 880 (DC 1994) (denied motion to dismiss); *United States* v. *Clarridge*, 811 F. Supp. 697 (DC 1992) (denied motion to dismiss); *United States* v. *North*, 708 F. Supp. 380 (DC 1988) (denied motion to dismiss).

"the proclivities of individuals." *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986). The opinion of one Justice that another's view of a statute was wrong, even really wrong, does not overcome the institutional advantages conferred by adherence to *stare decisis* in cases where the wrong is fully redressable by a coordinate branch of government.

This, then, is clearly a case where it is better that the matter be decided than that it be decided right. *Bramblett* governs this case, and if the rule of that case is to be overturned it should be at the hands of Congress, and not of this Court.