The WASHINGTON POST
COMPANY, Appellant,

v.

MINORITY BUSINESS OPPORTUNITY
COMMISSION, et al., Appellees.

No. 87–785.

District of Columbia Court of Appeals.

Argued March 8, 1989.
Decided June 16, 1989.

Barbara P. Percival, with whom Bois-feuillet Jones, Jr., Washington, D.C., and Denise E. Holmes were on the brief, for appellant.

Christopher M. Kerns, with whom Mitchell Barry Rosenfeld and Joseph F. Giordano, Washington, D.C., were on the brief, for appellees Fort Myer Const. Corp. and Opportunity Concrete Corp.

Edward E. Schwab, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee Minority Business Opportunity Com'n.

Before MACK, STEADMAN and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

The District of Columbia is committed by statute both to the right of its citizens to freedom of information and to the principle of affirmative action to correct the effects of past racial discrimination. This appeal requires us to consider the application of the first of these statutory policies to facts which potentially implicate the second.

Appellant Washington Post Company (the Post), relying on the District's Freedom of Information Act (FOIA), D.C.Code § 1–1521 *et seq.* (1987 Repl.), seeks access to extensive information in the possession of the District of Columbia Minority Business Opportunity Commission (MBOC). The requested materials relate to fifteen companies which have sought to participate as "local minority business enterprises" in the District's affirmative action "set-aside" program. MBOC and two of the affected businesses, which were permitted to intervene in the trial court, contend primarily that the information sought is exempt from the requirements of the Act because its disclosure would significantly impair the firms' competitive position. They apprehend that rejection of their claims of exemption would frustrate the purposes of a remedial civil rights law by providing non-minority competitors of minority enterprises, on a non-reciprocal basis, with information which could be used to the minority enterprises' competitive disadvantage.

The controversy began when MBOC declined to comply with a broad-ranging request from the Post to permit two of its reporters to inspect the applications of the fifteen enterprises for participation in the program, as well as supporting documentation for the applications and some additional materials. The Post brought suit in the Superior Court challenging MBOC's action. The trial judge granted summary judgment in favor of MBOC and the two intervening enterprises with respect to most of the documents sought, and the Post appeals from that judgment. We conclude that, as appellees effectively concede, the order sustaining claims of exemption by MBOC and the intervenors was too broad, and that the trial judge did not make a sufficient inquiry as to whether any part or parts of the requested materials could be segregated from the others and released without causing competitive injury to the affected companies. Accordingly, we reverse the judgment and remand for further proceedings.

I

Not so very many years ago, our capital city was rigorously divided by race into two societies so unequal that, in the words of a writer who cared about the title of his book, "young [black] men with college edu-

cations had to take jobs as bellhops and bus boys." KLUGER, SIMPLE JUSTICE 107 (1976). The schools were racially segregated by law, *see Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), job discrimination was rampant, *see generally* GREEN, WASHINGTON, A HISTORY OF THE CAPITAL, 1800–1950, 221–24, 474–75 (1962), and blacks and others were denied equal housing opportunity, *Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948), and access to places of public accommodation, *District of Columbia v. Thompson,* 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953), *rev'g* 92 U.S.App.D.C. 34, 203 F.2d 579 (1953).[1]

As a part of a policy of affirmative action designed to correct these and other injustices and to heal the wounds of the past, the Council of the District of Columbia enacted the Minority Contracting Act of 1976, D.C.Code § 1–1141 *et seq.* (1987 Repl.) and the Procurement Practices Act of 1985, § 1–1181 *et seq.* Finding that "a persistent pattern of racial discrimination" had deprived minority businesses of the opportunity to obtain a fair share of contracts and sub-contracts for construction and procurement in the public and private sectors, § 1–1141(1), the Council created the "sheltered market" program as a

means of partial redress.[2] Under that program, each District of Columbia agency must have as its goal a "set-aside" for certified minority enterprises of 35% of the dollar volume of its construction and procurement contracts, unless MBOC determines that a different allocation is appropriate. § 1–1146(a). Certified minority contractors compete with one another, preferably through sealed bidding, to obtain contracts within the sheltered market. *See* §§ 1–1183.3(a) and 1–1183.6. Many also compete on the open market for contracts which are not within the set-aside.

In order to participate in the sheltered market program, a business must demonstrate that it is in fact a minority enterprise, that it is local, and that it is qualified by expertise, experience and financing to perform the contract which it seeks. *See* 27 D.C.M.R. § 702.8. To that end, each applicant must complete two lengthy application forms. The first, an "Eligibility Statement", is designed to elicit whether the enterprise is in fact both minority and local. It consists of a ten-page questionnaire calling for a wide range of information about the enterprise and its owners and stockholders.[3]

The second application form, which is called a "business profile", is designed to

---

1. In *Thompson,* the United States Court of Appeals, in striking down a Reconstruction era ordinance prohibiting racial discrimination at restaurants, distinguished case law upholding "Jim Crow" laws requiring segregation at such establishments as follows:

 > We think such cases distinguishable from the instant case because in such cases the ordinances were in accord with a local custom of racial segregation on account of color and were held valid upon the theory that they were for the purpose of preserving peace and good order which would likely be interfered with by racial association. Ordinances in aid of the preservation of peace and order are indisputably within municipal power. The enactments involved in the instant case were *in conflict with local custom in respect of* race association and cannot therefore be justified as in aid of the preservation of peace and order.

 92 U.S.App.D.C. at 45, 203 F.2d at 590. This remarkable opinion, which was reversed by the Supreme Court as noted in the text, was written in 1953, exactly a century after the Council of the City of Washington had, as the court noted,

prohibited the sale of "spirituous liquors to any slave or other person of color on any day between sunset and sunrise." *Id.* at 45 n. 7, 203 F.2d at 590 n. 7.

2. Such programs are not immune from legal and other controversy. *Compare City of Richmond v. J.A. Croson Co.,* — U.S. —, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), *with Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).

3. Specifically, each enterprise must provide detailed information to support its claim of minority status, including birth certificates and other personal records of its principals, equal opportunity documentation, and proof of the extent to which bona fide minority participants have actual rights of ownership and control of the enterprise. The names, addresses and resumes of the principal owners, officers and directors of the enterprise must be disclosed. The applicant must also attach, among other things, copies of corporate documents, leases and documents of title, current balance sheets, profit and loss statements, and federal and District of Columbia tax returns for the past two years.

identify the types of contracts which the enterprise is equipped to perform. Applicants are required to submit in depth information regarding their corporate structure and by-laws, the financial structure and management of this enterprise, the ownership of stock in the company, and whether the company is certified as a minority business in any other jurisdiction. Individuals associated with the enterprise must reveal their other business interests. Each enterprise must provide information regarding any prior government contracting experience, as well as any history of debarment on its part or on the part of its principals, partners or stockholders. Applicants are also required to disclose previous services performed by the enterprise, the equipment which it owns, its sources of credit, its bonding capability, and any marketing techniques which it proposes to use in promoting its business.

## II

The materials which the Post sought to obtain from MBOC consisted primarily of the eligibility statements and business profiles described above. The Post also requested production of certain other documents relating to individual enterprises, and a number of memoranda prepared by District of Columbia employees in relation to the enterprises but transmitted only to other District of Columbia employees. In support of its motion for summary judgment, MBOC submitted the affidavit of its Executive Director, Maudine Cooper. Ms. Cooper stated that the extensive financial information which applicants submit to MBOC is "essential for the Commission to determine whether a business qualifies as a minority business." She related that public disclosure of this business and financial information would "seriously jeopardize the ability of the Commission" to obtain necessary data from enterprises seeking certification. According to Ms. Cooper, MBOC could not responsibly make its eligibility determinations without this information.

MBOC and the intervenors also submitted the affidavits of executives of the two intervening enterprises. These individuals attempted to explain how release of information which their companies had submitted to MBOC would prejudice their competitive posture. Lewis Shrensky, the secretary-treasurer of Fort Myer Construction Company, explained in some detail how his firm, which had bid on 200 projects during the previous year, would be harmed by public disclosure of financial information which it had submitted to MBOC because the information which it had provided could be used by competitors in anticipating whether Fort ·Myer would bid on a project, or the amount of any possible bid by the company. Shrensky also asserted that such information could be used by a labor union to its advantage in negotiating a collective bargaining agreement. Monte Newman, vice president of Opportunity Concrete, made similar claims for his company in more conclusory form. Neither affiant demonstrated or attempted to demonstrate that *none* of the documents sought could be disclosed without injury to his company's competitive position.

The Post did not present counter-affidavits in response to the motion for summary judgment. No affidavits or other materials were filed relating to the particular competitive circumstances of any of the enterprises which did not intervene in the litigation.

The trial judge granted summary judgment in favor of MBOC and the intervening enterprises on most issues in an order which reads, in its entirety, as follows:

Upon consideration of the cross-motions for summary judgment, the exhibits and memoranda of law submitted in support thereof, oral arguments of counsel, and the applicable statutes and case law, the Court reaches the following conclusions of law:

1. The information contained in the Eligibility Statements and Business Profiles of the Minority Business Opportunity Commission is exempt from disclosure under D.C.Code § 1–1524(a)(1).

2. The June 20, 1984 memorandum from Maudine Cooper, Director, Office

of Human Rights, to John E. Touchstone, Director, Department of Public Works, is exempt from disclosure under D.C.Code § 1–1524(a)(4).

3. As to the Granville Corporation, those documents which are internal District of Columbia memoranda, prepared by District of Columbia employees and transmitted only to other District of Columbia employees, are exempt from disclosure under D.C.Code § 1–1524(a)(4).

4. As to Automated Data Management, Severo Quality Food, Inc., Antenna Communications, Inc. and Tazel and Tazel, Inc., all documents are exempt from disclosure under D.C.Code § 1–1524(a)(1).[4]

5. All other documents discussed in the District of Columbia's Memorandum of Points and Authorities in Support of the Motion for Summary Judgment are not exempt from disclosure.

## III

### A. *The Policy Favoring Disclosure*

 Our Freedom of Information Act, like its federal counterpart, is designed to promote the disclosure of information, not to inhibit it. *Barry v. Washington Post Co.*, 529 A.2d 319, 321 (D.C.1987); *Dunhill v. Director, District of Columbia Dept. of Transp.*, 416 A.2d 244, 247 n. 5 (D.C. 1980);[5] *Department of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976); *Shanyland Water Supply Co. v. Block*, 755 F.2d 397, 398 (5th Cir.), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 697 (1985). The Act was designed to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Rose*, 425 U.S. at 361, 96 S.Ct. at 1599. Broadly conceived, the FOIA

seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such official information from possibly unwilling official hands.

*EPA v. Mink*, 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973). In the words of the noted historian Henry Steele Commager,[6] recently quoted by the Supreme Court in *United States Department of Justice v. Reporters Committee for Freedom of the Press*, —— U.S. ——, ——, 109 S.Ct. 1468, 1481, 103 L.Ed.2d 774 (1989),

The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know what their government is up to.

 Just as the provisions of the Act giving citizens the right of access are to be generously construed, so the nine statutory exemptions must be approached with a jaundiced eye. *Rose, supra*, 425 U.S. at 361, 96 S.Ct. at 1599. Indeed, these exemptions are to be narrowly construed, with ambiguities resolved in favor of disclosure. *Barry, supra*, 529 A.2d at 321; *Rose, supra*, 425 U.S. at 361–62, 96 S.Ct. at 1599; *Alirez v. N.L.R.B.*, 676 F.2d 423, 425 (10th Cir.1982). One who seeks to invoke one of these exemptions must prove that it applies; the burden is on the agency to sustain its action. *Shanyland Water Supply Corp., supra*, 755 F.2d at 398. The key to interpreting the Act "lies in providing a working formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure." *Mink, supra*, 410 U.S. at 80, 93 S.Ct. at 832, quoting S.Rep. No. 813, 89th

---

**4.** The withheld documents apparently consisted primarily of letters from clients, customers, and vendors, as well as correspondence with District of Columbia agencies and, in one case, with minutes of a meeting of the Board of Directors.

**5.** As this court noted in both *Barry* and *Dunhill*, many of the provisions of our FOIA parallel those in the federal statute. Accordingly, except where the two acts differ, we have treated case

law interpreting the federal FOIA as instructive authority with respect to our own Act. *See Grayson v. District of Columbia Department of Employment Services*, 516 A.2d 909, 911 n. 2 (D.C.1986).

**6.** *New York Review of Books*, October 5, 1972, p. 7.

Cong. 1st Sess., 3 (1965), U.S.Code Cong. & Admin.News 1966, p. 2418.

■ A document often contains some information which is exempt from disclosure and other information which is not. The Act does not contemplate an "all or nothing" approach where this situation arises. Section 1–1524(b) provides that

> Any reasonable segregable portion of a public record shall be provided to any person requesting such record after deletion of those portions which may be withheld from disclosure under subsection (a) of this section.

In the sensitive area of national security information, an agency must produce any reasonably segregable non-exempt parts of classified documents. *Hayden v. National Security Agency,* 197 U.S.App.D.C. 224, 231, 608 F.2d 1381, 1388, *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1979); *see Dunhill, supra,* 416 A.2d at 247 n. 6. Absent some differentiation in the statute—and we find none—the same obligation should apply with at least equal force in the present factual setting.

### B. *Competitive Injury*

■ Materials which, like most of those at issue here, were obtained from private parties, are not exempt from disclosure on that account. *Forsham v. Harris,* 445 U.S. 169, 183–187, 100 S.Ct. 977, 985–88, 63 L.Ed.2d 293 (1980); *Weisberg v. U.S. Dept. of Justice,* 203 U.S.App.D.C. 242, 245, 631 F.2d 824, 827 (1980). The basic purpose of the FOIA, however, was to "ensure an informed citizenry, vital to the functioning of a democratic society," and the Act was not intended to function as a private discovery tool. *N.L.R.B. v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978). Accordingly, salutary legislation enacted in the public interest is not to be converted into a vehicle for commercial espionage. As one of several measures designed to inhibit misuse of the Act, the Council exempted from disclosure in § 1–1524(a)(1)

> [t]rade secrets and commercial or financial information obtained from outside the government, to the extent that disclosure would result in substantial harm to the competitive position of the person from whom the information was obtained.

Section 1–1524(a)(1) differs from the corresponding provision in the federal FOIA, which exempts

> trade secrets and commercial or financial information obtained from a person and privileged or confidential.

*See* 5 U.S.C. § 552(b)(4) (1977 and 1988 Supp.).

■ The Post argues, and we agree, that the party seeking to invoke this exemption must show (1) that the party from whom the information was obtained faces actual competition, and (2) that disclosure will cause substantial competitive injury. *CNA Financial Corp. v. Donovan,* 265 U.S.App. D.C. 248, 268, 830 F.2d 1132, 1152 (1987). The affidavits which have been submitted and MBOC's explanation of the sheltered market process provide sufficient evidence of the existence of actual competition. The issue of competitive injury is more difficult.

The federal provision protecting privileged and confidential information, like the other statutory exemptions, has been narrowly construed. *Soucie v. David,* 145 U.S.App.D.C. 144, 155, 448 F.2d 1067, 1078 (1971). The District of Columbia statute, however, explicitly focuses on the question of harm to the competitive position of the person providing the information. Moreover, we are dealing here with a situation which implicates the capacity of minority enterprises to compete with non-minority firms outside the sheltered market. Accordingly, we think the task of balancing the competing policies is an especially sensitive one.

### C. *The Governing Principles Applied*

■ Applying the foregoing principles to the record before us, we are compelled to conclude that the trial judge used too broad a brush in sustaining the claims of exemption. At oral argument, counsel for MBOC and, to a lesser extent, counsel for the intervenors, conceded that not all of the materials submitted in or with the eligibility statements and business profiles was exempt. The soundness of these concessions is surely apparent from the informa-

tion which these forms require applicants to provide. We agree, for example, that entrepreneurs should not be put in the position of having their marketing techniques made a part of the public record and available as a windfall to their competitors. In the absence of proffered reasoning to the contrary, on the other hand, we are not persuaded that disclosure of the race, *per se,* of the principals of an enterprise would lead to competitive injury, nor do we discern any basis in the affidavits submitted by MBOC or intervenors that such injury could result.[7]

Not every document or part thereof is either obviously exempt or obviously non-exempt. Moreover, there is no indication in the record that the trial judge made a determination as to whether the exempt portion of any document can reasonably be segregated from the remainder, as required by § 1–1524(b). Accordingly, we must remand the case for a more detailed analysis by the trial judge.

## D. *Procedures on Remand*

In this case, as in *Soucie v. David, supra,*

> We think it proper for the [trial judge] to examine *in camera* the individual papers which are alleged to be privileged, and direct exclusions or excisions in a manner deemed lawful and appropriate, keeping in mind the issues of the case, the nature and importance of the interests supporting the claim of privilege, and the fundamental policy of free societies that justice is usually promoted by disclosure rather than secrecy.

145 U.S.App.D.C. at 156 n. 50, 448 F.2d at 1079 n. 50. The court should determine with respect to each document or class of documents furnished by each enterprise, whether MBOC or intervenors have established, through the affidavits filed in support of the motion and any reasonable inferences that may be drawn therefrom, that a specific exemption applies. The court should also consider and resolve the question of reasonable segregability with respect to each document or class of documents.

■ In general, findings of fact are not required where a court grants summary judgment. *See* Super.Ct.Civ.R. 56. Indeed, that remedy is available only when there is no material issue of fact. We are also reluctant to require procedures in FOIA cases which differ from those in other litigation. Nevertheless, given the complexity and sensitivity of the issues here presented, we agree with the court in *Founding Church of Scientology v. Bell,* 195 U.S.App.D.C. 363, 368, 603 F.2d 945, 950 (1973) that the trial judge must make a careful *de novo* review of the agency's determinations and must provide a decision which is sufficiently detailed to establish that this review has in fact taken place. Appellate courts are ill-equipped to conduct their own investigation into the validity of specific claims of exemption, and the trial judge should therefore articulate the precise relationship between each such claim and the contents of specific documents held to be exempt. *Van Bourg, Allen, Weinberg & Roger v. N.L.R.B.,* 656 F.2d 1356, 1358 (9th Cir.1981).[8]

Since a remand is required, we do not decide at this time, but refer to the trial court for initial determination, a legal issue on which the parties disagree, namely, whether the District's FOIA, like its federal counterpart, permits the court to consider MBOC's contention[9] that disclosure of the materials in question would make it difficult for the District to obtain information from minority enterprises in the future, and would thus inhibit the success of the sheltered market program. *Compare Greenberg v. Food & Drug Administration,* 256 U.S.App.D.C. 135, 138, 803 F.2d

---

7. The Post's interest in such racial information is understandable, for the public has a stake in ensuring that non-minority entrepreneurs do not use minority individuals as a front in order to secure an unwarranted entree into the sheltered market. *See, e.g. M.B.E., Inc. v. Minority Business Oppor. Comm'n,* 485 A.2d 152 (D.C. 1984).

8. Contrary to MBOC's contention in its brief, the issue is not whether the trial judge must write an opinion. She need not do so. An oral decision on the record which fully addresses the concerns described in this opinion would be sufficient.

9. This is the gravamen of the affidavit of Maudine Cooper.

1213, 1216 (1986) with *Belth v. District of Columbia Dept. of Consumer and Regulatory Affairs,* 115 Daily Wash.L.Rptr. 2281 (Super.Ct.D.C.1987) (Kessler, J.). In light of our remand with respect to the judge's order sustaining appellee's claims of exemption under § 1–1524(a)(1) on the basis of potential competitive injury, we also direct the trial judge to elaborate on her findings with respect to the other claimed exemptions.[10] We further leave to the trial judge's initial determination the extent, if any, to which affidavits by officers of the intervening enterprises which describe potential competitive injury to them may be used to protect materials supplied by other applicants for participation in the sheltered market.

### IV

For the foregoing reasons, the judgment is reversed and the case remanded for proceedings consistent with this opinion.

*So ordered.*

---

10. We have not found sufficient information in the record, for example, to enable us to review meaningfully the trial judge's ruling sustaining claims under § 1–1524(a)(4) (exemption for inter-agency communications which would not be available to private parties in litigation with the agency) for a memorandum from the Director of the Office of Human Rights to the Director of the Office of Public Works and for certain documents relating to the Granville Corporation. *See Vaughn v. Rosen,* 173 U.S.App.D.C. 187, 195, 523 F.2d 1136, 1144 (1975) (corresponding federal exemption applies only to documents which are part of the deliberative process).