**Daniel WEMHOFF, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 04–CV–1310.

District of Columbia Court of Appeals.

Argued Nov. 9, 2005.

Decided Dec. 15, 2005.

Daniel Wemhoff, pro se.

Sidney R. Bixler, Assistant Attorney General for the District of Columbia, with whom Robert J. Spagnoletti, Attorney General, Edward E. Schwab, Deputy Attorney General, and Rosalyn Calbert Groce, Chief, Juvenile and Criminal Section, were on the brief, for appellee.

Before FARRELL and REID, Associate Judges, and NEBEKER, Senior Judge.

REID, Associate Judge:

This case involves an appeal from the denial of a request for information under the District of Columbia Freedom of Information Act ("the FOIA"), D.C.Code §§ 2–531 *et seq.;* the request concerned the identity and addresses of motorists who received traffic violation citations as a re-sult of being photographed by a "red light camera" at a particular intersection. After the trial court dismissed his complaint with prejudice, appellant Daniel Wemhoff filed an appeal challenging the trial court's construction of various statutory provisions relating to his FOIA request. We affirm the judgment of the trial court.

In July 2003, Mr. Wemhoff sent a letter to the District of Columbia Department of Motor Vehicles ("the DMV") requesting certain information under the FOIA. Specifically, he asked for:

> All records—with redactions as necessary ... to protect personal identity—of all motorists who were "caught" by your photo/red light camera stationed on the H Street Bridge [in the Northeast quadrant of the District of Columbia] approaching the corner of North Capitol Street. This would include addresses of those issued automatic citations.

The DMV advised Mr. Wemhoff on September 17, 2003, that the "photo/red light cameras ... are administered by the Metropolitan Police Department ('MPD')," but that, at any rate, the "driver record database does not include the location of a particular photo red light camera and thus is not searchable using the criterion ... provided [by Mr. Wemhoff]." Furthermore, the DMV advised that even if it could provide the requested records, "the addresses would not be releasable under [the] FOIA" because they are "exempt[ed] from disclosure by ... federal statute, the Driver's Privacy Protection Act ['the DPPA'], 18 USC 2721 *et seq.*," and by D.C.Code § 2–534(2) (2001).

Subsequently, Mr. Wemhoff filed a complaint in the trial court on December 3, 2003, seeking declaratory and injunctive relief compelling the District to provide the information requested under the FOIA. Sometime around early July 2004, Mr. Wemhoff filed a motion for summary

judgment, and on July 20, 2004, the District filed a motion to dismiss Mr. Wemhoff's complaint, or in the alternative, for summary judgment. Mr. Wemhoff submitted an affidavit stating that he requested the records in connection with a civil [class action] he had filed.[1] The trial court docketed an order on September 2, 2004, denying Mr. Wemhoff's motion for summary judgment and granting the District's motion to dismiss the complaint. Essentially, the trial court determined that the records sought were exempt from disclosure under the FOIA and the DPPA.[2] On September 28, 2004, the MPD sent Mr. Wemhoff a letter stating that "[t]he [D]epartment does not store the information [he][had] requested," and further indicated that even if the information were available, it could not be released under the FOIA because, to do so, "would constitute an unwarranted invasion of personal privacy."

## ANALYSIS

Mr. Wemhoff insists that he is entitled to the information requested. He contends that: "The District's position on disclosing 'personal information' of 'traffic violations' not only violates a specific provision of its own motor vehicle code [D.C.Code § 50–1301.05(a) (2001)], mandating the information requested, but it likewise ignores the broad exceptions to the privacy exemptions, as enumerated under the DPPA...." He specifically takes issue with the District's use of the "unwarranted invasion of personal priva-

cy" exception set forth in D.C.Code § 2–534(2), and its reliance on the DPPA, 18 U.S.C. § 2721(a)(1), with respect to the "exempt[ion] from disclosure by statute" provision of D.C.Code § 2–534(6). Mr. Wemhoff also claims that, despite its assertion to the contrary, the District could retrieve the information he seeks through its contractor.

The District argues that, under § 2–534(2), and in the alternative § 2–534(6), it is precluded from releasing the names and addresses requested. Moreover, the District emphasizes that it does not have the information which Mr. Wemhoff seeks. And, the District maintains that D.C.Code § 50–1301.05 does not provide authority for the disclosure of the requested records.

Because this case involves a legal issue requiring the interpretation of various statutory provisions, our review is *de novo*. *See Abadie v. District of Columbia Contract Appeals Bd.*, 843 A.2d 738, 741 (D.C.2004) (citing *Belcon, Inc. v. District of Columbia Water & Sewer Auth.*, 826 A.2d 380, 384 (D.C.2003); *In re Estate of Green*, 816 A.2d 14, 16 (D.C. 2003)). " 'Statutory construction is a holistic endeavor, and, at a minimum, must account for a statute's full text, language ..., structure, and subject matter.' " *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 652 (D.C.2005) (en banc) (citing *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am.*, 508 U.S. 439, 455, 113 S.Ct. 2173,

---

1. That action was dismissed, apparently because he could not identify the "red light camera violators" who had received citations relating to the North Capitol and H Streets location. The purpose of the lawsuit appears to have been a request for relief for persons who actually paid fines in response to the red light camera violations, in light of the fact that some drivers who had not paid for the violations were given amnesty by the District,

after it decided to remove the camera because it was not functioning properly.

2. In addressing the reason why Mr. Wemhoff sought the records, the trial judge said: "Plaintiff, a lawyer, does not dispute that he wants this information so that he can solicit these individuals to bring a class action lawsuit against the District of Columbia for negligence and 'selective enforcement' of the law."

124 L.Ed.2d 402 (1993) (citation and internal quotation marks omitted)). " 'The text of an enactment is the primary source for determining its drafters' intent.' " *Id.* at 651 (citation omitted). " 'In the ordinary case, absent any indication that doing so would frustrate [the legislature's] clear intention or yield patent absurdity, our obligation is to apply the statute as [the legislature] wrote it.' " *Id.* (citing *Hubbard v. United States,* 514 U.S. 695, 703, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995)) (other citation omitted). "At the same time, we do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them." *Id.* at 652 (citation omitted). And, " 'if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them.' " *Luck v. District of Columbia,* 617 A.2d 509, 514 (D.C.1992) (citation omitted).

 The District has a general policy favoring public access to and disclosure of its public records, but that policy is not without limitation. Its general statement of public policy specifies that: "[A]ll persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees." D.C.Code § 2–531 (2001); *see The Washington Post Co. v. Minority Bus. Opportunity Comm'n,* 560 A.2d 517, 521 (D.C.1989) (citing *Dunhill v. Director, District of Columbia Dept. of Transp.,* 416 A.2d 244, 247 n. 5 (D.C.1980) (other citations omitted)). Yet, while there is a policy of "expansion of public access," persons are not entitled to any and all information contained in public records, but only that relating to the affairs of government and official acts of officials and employees. *Id.* Moreover, the right of public access is limited by statutory exceptions which, con-

sistent with the general public policy of access, must be read narrowly. *See Newspapers, Inc. v. Metropolitan Police Dep't,* 546 A.2d 990, 993 (D.C.1988) (citing *Dunhill, supra*); *see also* D.C.Code § 2–532(a) ("Any person has a right to inspect, and at his or her discretion, to copy any public record of a public body, except as otherwise expressly provided by § 2–534 ...."). There are two main exceptions to the general policy of access to public records at issue in this case, D.C.Code §§ 2–534(a)(2) and (6), which provide:

(a) The following matters may be exempt from disclosure under the provisions of this subchapter: ...

(2) Information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy; ...

(6) Information specifically exempted from disclosure by statute (other than this section), provided that such statute:

(A) Requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(B) Establishes particular criteria for withholding or refers to particular types of matters to be withheld ....

The trial court based its judgment on both of these provisions. We find it necessary to consider only one of the provisions, and focus on § 2–534(a)(6).

 The question we confront concerning § 2–534(6) is whether the District properly invoked it to bar disclosure of the information sought by Mr. Wemhoff. Mr. Wemhoff relies on a sentence in D.C.Code § 2–534(c) stating that § 2–534 "shall not operate to permit nondisclosure of information of which disclosure is authorized or mandated by other law." He argues that the District has a policy of disclosing personal information relating to traffic viola-

tions, as set forth in D.C.Code § 50–1301.05(a)(1), and hence, cannot refuse his FOIA request. Section 50–1301.05(a)(1) provides that:

> The Mayor shall, upon request, furnish any person a certified abstract of the District of Columbia operating record of any person subject to the provisions of this chapter, which abstract shall include enumeration of any motor vehicle accidents in which such person has been involved and reference to any convictions of said person for violation of the motor vehicle laws as reported to the Mayor and a record of any vehicles registered in the name of such person
> . . . .

This provision was enacted by Congress in 1954, as part of the "Motor Vehicle Safety Responsibility Act of the District of Columbia." D.C.Code § 50–1301.01 (2001). That Act was designed "to promote safe driving, to eliminate the reckless and financially irresponsible driver from the highways, and to provide for the giving of security and proof of financial responsibility by persons driving or owning vehicles of a type subject to registration under the laws of the District of Columbia." Pub.L. No. 365, 68 Stat. 120, 147 (1954) (codified as amended at D.C.Code § 50–1301.01 (1981)). Hence, disclosure of an "abstract of [a] District of Columbia operating record of [a] person subject to the provisions of [the] Act" was required as an aid to persons who may have been injured in automobile accidents and who may have been seeking compensation for their injuries. *See Dunhill, supra,* 416 A.2d at 248 n. 7. Mr. Wemhoff is not requesting information to be used for the purpose of determining the financial responsibility of motorists who may have been involved in motor vehicle accidents. Rather, he wants to solicit persons for his lawsuit who may have received and paid photo/red light camera citations relating to the North Capitol and H Streets location. Solicitation of motor vehicle drivers, and use of driver operating records for matters unrelated to accidents fall outside the intent of Congress in enacting the Motor Vehicle Safety Responsibility Act. In short, Mr. Wemhoff cannot gain access to the information he desires for his stated purpose by relying on § 50–1301.05(a)(1).

■ Mr. Wemhoff also contends that the DPPA, 18 U.S.C. § 2721, authorizes his access to the information he seeks. Section 2721(a) begins with a prohibition on the disclosure of personal information:

> (a) In general. A State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity:
>
> (1) personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section . . . .

"Personal information" is defined in 18 U.S.C. § 2725(3) as:

> information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5–digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status.

Section 2721(b) addresses the circumstances under which personal information, including the name and address of a motorist, may be disclosed under the DPPA.[3]

---

**3.** 18 U.S.C. § 2721(b) (2005) provides:

Permissible uses. Personal information re-

Mr. Wemhoff relies on § 2721(b)(4), the "investigation in anticipation of litigation" exception which states in full:

(4) For use in connection with any civil, criminal, administrative, or arbitral pro-

ferred to in subsection (a) shall be disclosed for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records from the original owner records of motor vehicle manufacturers to carry out the purposes of titles I and IV of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act (15 U.S.C. 1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), and chapters 301, 305, and 321–331 of title 49 [49 USCS §§ 30101 et seq., 30501 et seq., 32101 et seq.–33101 et seq.], and, subject to subsection (a)(2), may be disclosed as follows:

(1) For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

(2) For use in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities, including survey research; and removal of non-owner records from the original owner records of motor vehicle manufacturers.

(3) For use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only—

(A) to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and

(B) if such information as so submitted is not correct or is no longer correct, to obtain the correct information, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual.

(4) For use in connection with any civil, criminal, administrative, or arbitral pro-

ceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement

ceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

(5) For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals.

(6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.

(7) For use in providing notice to the owners of towed or impounded vehicles.

(8) For use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection.

(9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49 [49 USCS §§ 31301 et seq.].

(10) For use in connection with the operation of private toll transportation facilities.

(11) For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains.

(12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

(13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.

(14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety.

18 U.S.C. § 2721(b) (2005).

of judgments and orders, or pursuant to an order of a Federal, State, or local court.

*Pichler v. UNITE (Union of Needle-trades, Industrial & Textile Employees AFL–CIO), et al.,* 339 F.Supp.2d 665 (E.D.Pa.2004), a non-FOIA case, which interpreted the "investigation in anticipation of litigation" exception, differs from the matter before us.[4] *Pichler* concerned a labor organizing dispute in which the appellants alleged that a labor union took down license plate numbers from cars located outside of a corporation whose employees it sought to organize, then acquired the addresses of the owners of those vehicles, and later contacted them at their homes. *Id.* at 666. Appellants sued the union for alleged violations of the DPPA, and the union moved to dismiss the appellants' complaint. The trial court denied the motion to dismiss and allowed the case to move forward to discovery, "because the complaint [did] not establish that the [investigation in anticipation of] litigation exception applie[d]" to the case. *Id.* at 668. The court believed that "[a]fter discovery . . ., the [u]nion[ ] may be able to prove that the litigation exception permitted them to access the plaintiffs' personal information." *Id.* Therefore, the court considered the meaning of the exception.

The *Pichler* court declared that "the exception applies only if a defendant obtains protected information for a permitted 'use,. . . [and that] use' implies a rea-sonable likelihood that the decision maker would find the information useful in the course of the proceeding." *Id.* To show that identifying information fell within the "investigation in anticipation of litigation exception," the unions "must prove that (1) they undertook an actual investigation; (2) at the time of the investigation, litigation appeared likely; and (3) the protected information obtained during the investigation would be of 'use' in the litigation . . . ." *Id.* The court believed that its test represented a narrow construction of the exception and would help to safeguard an individual's privacy: "This construction ensures that individuals' statutorily recognized rights to the privacy of their motor vehicle records are not sacrificed whenever a litigant raises the possibility of a tenuous connection between the protected information and issues tangentially related to a conceivable litigation strategy." *Id.* Rather than envisioning assistance in the solicitation of clients for a potential lawsuit, the test articulated in *Pichler* focuses on the use of protected information in actual or "likely" litigation, and where the information would be "of use in the litigation" in the sense of being material to its subject matter. In stressing the need for "an actual investigation" as the first prong of its test, we believe that the court meant the type of background work or search for material which would determine, substantively, whether one has a viable theory of

---

4. Nor is *Manso v. Santamarina & Assocs.,* No. 04 Civ. 10276, 2005 WL 1182298, 2005 Dist. LEXIS 7316 (S.D.N.Y. Apr.26, 2005), a FOIA case. There, the court found the litigation exception applicable (in a lawsuit which alleged, in part, a violation of the DPPA), because the personal information protected by the DPPA was "useful" to show that the plaintiff had lied in an affidavit filed in a related [legal] action. Similarly, in *Cowan v. Ernest Codelia, P.C.,* 149 F.Supp.2d 67 (S.D.N.Y. 2001), a non-FOIA case, the court determined that the litigation exception did not apply because "a reasonable juror could find that the DMV searches and the subsequent sending of [an empty] envelope [to the home of an Assistant District Attorney who was assigned to prosecute one of the defendants' clients] was not for use in connection with a criminal proceeding [within the meaning of 18 U.S.C. § 2724(b)(4) ] but rather was to threaten or harass [the ADA] for personal reasons." *Id.* at 79.

litigation, or enough of a basis to avoid a motion for sanctions on the ground that a frivolous lawsuit has been filed. Based upon *Pichler*, and our own reading of § 2721, acquiring personal information from the motor vehicle records for the purpose of finding and soliciting clients for a lawsuit is not a "permissible use" within the meaning of § 2721(b).

 Our conclusion is buttressed by an examination of all of the exceptions under § 2721(b). Notably, "we do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental in understanding them." *Beretta, supra,* 872 A.2d at 652. When considering § 2721(b)'s "full text, language . . ., structure, and subject matter," *id.* (omission in original), the exceptions highlight who may access personal information and the authorized uses of that information. Personal information may be disclosed to government agencies or their agents (*e.g.,* subsections (1) and (7)), or to licensed private investigative or security entities (subsection 8). It may be disclosed for the purpose of ensuring driver or public safety (subsections (2), (9), and (14)), or accuracy in legitimate business records to guard against fraud (subsection (3)), and to investigate the validity of insurance claims (subsection (6)). Mr. Wemhoff is not an agent of the government; nor does he desire the personal information in the motor vehicle records for any of the purposes listed above.

Furthermore, the limitations embodied in subsections (5), (11), (12), and (13) suggest that Congress did not intend that personal information in motor vehicle records would be used to contact persons to become plaintiffs in a lawsuit, nor that such information would be disclosed, without the consent of the affected person. As the trial court noted in this case, subsection (5), which "immediately follows" the litigation exception and addresses "disclosure for research activities," contains an explicit condition on disclosure. The personal information may be released "so long as [it] is not published, redisclosed, or used to contact individuals."

The consent provisions of subsections (11), (12), and (13) underscore Congress' intent to restrict access to personal information contained in motor vehicle records. Subsection (12), which addresses "bulk distribution for surveys, marketing or solicitations," requires "the State [to] obtain[ ] the express consent of the person to whom such personal information pertains" before it can be disclosed. 18 U.S.C. § 2721(b). Subsection (11) mandates that, the State "obtain[ ] the express consent of the person to whom such personal information pertains." *Id.* And, subsection (13) explicitly states that personal information may be disclosed to "any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains." *Id.*

That Congress deemed the requirement of consent in subsections (11), (12) and (13) to be vitally important is clear from the legislative history of § 2721. The House Conference Report on the DPPA discusses only four of the fourteen exceptions set forth in § 2721(b), including those in subsections (11), (12), and (13), all of which require consent of the motorist whose personal information is sought. As originally drafted, subsections (b)(11)and (12) were worded differently from the current version of those subsections; the State had to provide an opportunity for motorists to prohibit disclosures.[5] In 1999, subsections

---

5. As the House Conference Report states:

The opportunity to prohibit disclosure of personal information under (b)(11) and

(11) and (12) were simplified, but consent remained an express requirement. Subsection (13), which concerns "use by any requester," has never been changed; the personal information may be disclosed only "if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains." The House Conference Report emphasized the necessity for "written consent":

> Under subsection (b)(13), any requestor may obtain access to an individual's personal information if the requestor has obtained written consent from the individual whose personal information is sought. The Conferees intend that each State must provide that the requestor's demonstration include a written consent that was been notarized.

H.R.Rep. No. 103–711, at 401 (1994) (Conf. Rep.), *reprinted in* 1994 U.S.C.C.A.N., 1868, 1869.

 One other provision manifests Congress' intent to restrict access to personal information under the DPPA. Section 2724 authorizes a private right of action against "[a] person who knowingly obtains, discloses or uses personal information from a motor vehicle record, for a purpose not permitted . . . , [and makes the person who violates the DPPA] liable to the individual to whom the information pertains . . . ," without any showing that the person to whom the personal information pertains "suffered any adverse effect." *Schmidt v. Multimedia Holdings Corp.*, 361 F.Supp.2d 1346, 1348, 1354 (M.D.Fla. 2004). Thus, if a District employee dis-

closes personal information in the motor vehicle records for the purpose of allowing solicitation of clients by a private attorney, that employee arguably would be vulnerable to a lawsuit, as would be the private attorney if he used the personal information to find clients for a class action lawsuit.

In sum, we conclude that D.C.Code § 2–534(6) does not authorize the disclosure of personal information from the District's motor vehicle records for purpose of solicitation of clients, because the DPPA, 18 U.S.C. § 2721, prohibits such disclosure and use. As the trial court observed, Mr. Wemhoff "is free to put an ad in a newspaper announcing his intentions and soliciting potential class members."

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.[6]

*So ordered.*

---

(b)(12) does not have to be provided each time a request for such information is made. Instead, the opportunity to prohibit these disclosures should be provided at the time an individual registers for or renews his or her driver's license, title, registration or identity card and at any other time an individual contacts the State on his or her own initiative to prohibit such disclosures.

H.R. REP. NO. 103–711, at 401 (1994) (Conf. Rep.), *reprinted in* 1994 U.S.C.C.A.N., 1868, 1869.

**6.** Given our disposition under D.C.Code § 2–534(a)(6) and the DPPA, 18 U.S.C. § 2721, we do not address the question of the applicability of the invasion of privacy provision of § 2–534(a)(2).