WETHERELL, J.,
dissenting.
I dissent.
The judge of compensation claims (JCC) found that Westphal was not yet at maximum medical improvement (MMI) and this finding is supported by competent substantial evidence. Thus, under the rule announced in City of Pensacola Firefighters v. Oswald, 710 So.2d 95 (Fla. 1st DCA 1998), and reaffirmed by the en banc court less than two years ago in Matrix Employee Leasing, Inc. v. Hadley, 78 So.3d 621 (Fla. 1st DCA 2011), in order to obtain permanent total disability (PTD) benefits, Westphal had the burden to prove that (1) he was totally disabled when his 104 weeks of temporary total disability (TTD) benefits expired and (2) he will be permanently and totally disabled upon reaching MMI. The JCC found that Westphal proved the first element, but not the second, and accordingly denied the petition for PTD benefits.
This ruling is in accord with the applicable statutes and this court’s settled precedent and, contrary to the original panel opinion, does not render any portion of section 440.15, Florida Statutes, unconstitutional.[11] Accordingly, the JCC’s order should be affirmed.
The majority opinion avoids the result compelled by the facts and existing law by receding from Hadley and reinterpreting the applicable statutes. Judge Thomas’ concurring in result only and dissenting in part opinion avoids this result by reweighing the evidence before the JCC. I disagree with both approaches.
I
The approach adopted by the majority is an unprecedented flip-flop. This court has receded from panel opinions in the past, but prior to this case, the court had never receded from an en banc opinion.
The en banc decision repudiated by today’s majority opinion reaffirmed 15 years’ worth of settled case law. It also expressly, and emphatically, rejected the precise interpretation of section 440.15 that the majority adopts today.
To make matters worse, the approach adopted by the majority was not even raised by the parties. It was mentioned[12] by two of the amicus curiae as a fall-back approach to preserve the constitutionality of section 440.15 if the en banc court was inclined to agree with the original panel decision; however, these amici made clear *466 that their first preference was for the court to reaffirm the interpretation of section 440.15 as laid out in Oswald and Hadley.[13] Moreover, Westphal expressly-disavowed any reliance on the fail-back approach advanced by these amici in his supplemental briefs when he referred to the approach as “impractical [and] unworkable” and he asserted that “[t]here is no alternative [statutory] interpretation to [that in] the Hadley case.”
It is unclear whether the majority elected to reinterpret section 440.15 in order to avoid declaring the statute unconstitutional or whether it did so simply because three additional votes could be mustered since the last failed effort to recede from Oswald. However, it appears that the latter occurred because the majority opinion conspicuously avoids any suggestion that the statute would be unconstitutional if it were not reinterpreted. And at least two of the eight judges who voted to recede from Hadley are of the view that “our prior interpretation [of the statute] met constitutional scrutiny.” See swpra, at 449 (Wolf, J., concurring, joined by Lewis, C.J.).
The en banc court certainly has the authority to recede from a prior en banc decision, either at the urging of a party or sua sponte. But just because the court can do so, does not mean that it should. Indeed, the doctrine of stare decisis requires this court to adhere to settled precedent unless there is a compelling reason to recede from it. See Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 362, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (“Our precedent is to be respected unless the most convincing of reasons demonstrates that adherence to it puts us on a course that is sure error.”); id. at 377, 130 S.Ct. 876 (Roberts, C.J., concurring) (stating that “departures from precedent are inappropriate in the absence of a ‘special justification’ ”) (quoting Arizona v. Rumsey, 467 U.S. 203, 212, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984)).
Moreover, “a decision to overrule should rest on some special reason over and above the belief that a prior case was wrongly decided.” Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 864, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); see also Hubbard v. United States, 514 U.S. 695, 716, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995) (Scalia, J., concurring in part and concurring in the judgment)(“The doctrine of stare deci-sis protects the legitimate expectations of those who live under the law, and ... is one of the means by which exercise of ‘an arbitrary discretion in the courts’ is restrained, [citation omitted]. Who ignores it must give reasons, and reasons that go beyond mere demonstration that the overruled opinion was wrong (otherwise the doctrine would be no doctrine at all).”); Brown v. Nagelhout, 84 So.3d 304, 309 (Fla.2012) (“Stare decisis does not yield based on a conclusion that a precedent is merely erroneous.”). This does not mean that a court is required to blindly adhere to a decision that is patently wrong; however, the majority’s broad assertions that an appellate court should always be “willing to consider the correctness of its prior *467 work” and “willing to admit that it has made a mistake” espouses a theory of stare decisis that is more suited for a supreme court construing the constitution than it is for an intermediate court of appeal construing a statute because in the former situation, the only way to correct an erroneous interpretation is by amending the constitution, whereas in the latter situation, an erroneous interpretation can be corrected by a higher court or by the Legislature amending the statute. Compare Payne v. Tennessee, 501 U.S. 808, 828, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (noting that the fact that stare decisis is not an inexorable command “is particularly true in constitutional cases, because in such cases, ‘correction through legislative action is practically impossible.’ ”) (quoting Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 407, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandéis, J., dissenting)) and Webster v. Reprod. Health Servs., 492 U.S. 490, 518, 109 S.Ct. 3040,106 L.Ed.2d 410 (1989) (plurality) (explaining that stare decisis “has less power in constitutional cases, where, save for constitutional amendments, [the Supreme] Court is the only body able to make needed changes”) with Ill. Brick Co. v. Ill., 431 U.S. 720, 736, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (explaining that “considerations of stare decisis weigh heavily in the area of statutory construction, where Congress is free to change this Court’s interpretation of its legislation”).
Stare decisis “is grounded on the need for stability in the law and has been a fundamental tenet of Anglo-American jurisprudence for centuries.” N. Fla. Women’s Health & Counseling Servs., Inc. v. State, 866 So.2d 612, 637 (Fla.2003). It is “the means by which [courts] ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion.” Vasquez v. Hillery, 474 U.S. 254, 265, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); see also State v. Gray, 654 So.2d 552, 554 (Fla.1995) (“Stare decisis provides stability to the law and to the society governed by that law.”).
Stare decisis contributes to the legitimacy of the courts and the integrity of our constitutional system of governance, both in appearance and in fact, by requiring decisions to be grounded in the rule of law “rather than in the proclivities of individuals.” Vasquez, 474 U.S.at 265, 106 S.Ct. 617; see also State v. J.P., 907 So.2d 1101, 1109 (Fla.2004) (“As an institution cloaked with public legitimacy, this Court cannot recede from its own controlling precedent when the only change has been the membership of the Court.”). Accordingly, “[w]here a rule of law has been adopted after reasoned consideration and then strictly followed over the course of years, the rule should not be abandoned without a change in the circumstances that justified its adoption.” State v. Schopp, 653 So.2d 1016, 1023 (Fla.1995) (Harding, J., dissenting) (cited with approval in N. Fla. Women’s Health & Counseling Servs., 866 So.2d at 637 n. 59); see also Perez v. State, 620 So.2d 1256, 1261 (Fla.1993) (Overton, J., concurring) (explaining that “[dissenters ordinarily accept the majority view in subsequent decisions where the issue involved two intellectually reasonable but opposing views” and noting that the contrary approach “undermines the rule of law and places courts in the political arena”) (cited with approval in N. Fla. Women’s Health & Counseling Servs., 866 So.2d at 637 n. 59) (emphasis added); Tyson v. Mattair, 8 Fla. 107, 124-25 (1858) (“It is an established rule to abide by former precedents, stare decisis, where the same points come again in litigation, as well to keep the scale of justice even and steady, and not liable to waiver with every new judge’s opinion .... [citation omitted]. Where a rule has become settled law, it is *468 to be followed.... If there is a general hardship affecting a general class of cases, it is a consideration for the Legislature, not for a Court of Justice.”) (emphasis in original).
Stare decisis has “special force” where the legislative branch has relied upon or acquiesced in the ruling in the prior case. See Hubbard, 514 U.S. at 714, 115 S.Ct. 1754 (“Stare decisis has special force when legislators or citizens ‘have acted in reliance on a previous decision, for in this instance overruling the decision would dislodge settled rights and expectations or require an extensive legislative response.’ ”) (quoting Hilton v. S.C. Pub. Rys. Comm’n, 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991)); see also Ill. Brick Co., 431 U.S. at 736, 97 S.Ct. 2061; Boys Mkts., Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 257-58, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) (Black, J., dissenting) (“[W]hen this Court first interprets a statute, then the statute becomes what this court has said it is.... When the law has been settled by an earlier case then any subsequent ‘reinterpretation’ of the statute is gratuitous and neither more nor less than an amendment: it is no different in effect from a judicial alteration of language that Congress itself placed in the statute.”); Gulfstream Park Racing Ass’n v. Dep’t of Bus. Regulation, 441 So.2d 627, 628 (Fla.1983) (“When the legislature reenacts a statute which has a judicial construction placed upon it, it is presumed that the legislature is aware of the construction and intends to adopt it, absent a clear expression to the contrary.”). Here, not only has the Legislature not amended section 440.15 in response to Oswald, but it has described the decision as “consistent with legislative intent” and “a precedent that the Legislature has left intact.” See Brief of the Florida Senate and the Florida House of Representatives as Amici Curiae in Support of Appellees, at 9,18.
Stare decisis is especially important when this court decides workers’ compensation cases because those involved in the workers’ compensation system look to this court’s decisions to provide the certainty and stability in the law that is needed for the self-executing system to operate as intended. Additionally, the workers’ compensation bench and bar need to be able to rely on this court’s definitive interpretations of the law without concern that the interpretation will change the next time the issue is before the court.
Here, there is no compelling reason to recede from the rule announced in Oswald. Nothing except the composition of the court and the minds of several judges has changed since Hadley when this court, sitting en banc, reaffirmed Oswald and expressly rejected the precise interpretation of section 440.15 that the majority opinion now embraces.
The interpretation of the statute adopted by the current majority is no more persuasive today than it was two years ago when it was contained, almost verbatim, in the dissent in Hadley. The court rightly rejected this interpretation in Hadley, explaining:
The statutory interpretation advocated by the dissent would eliminate the “gap” by equating the expiration of the eligibility for temporary benefits with the date of MMI, as that phrase is used in the definition of “permanent impairment.” The main problem with this interpretation is that “date of maximum medical improvement” is statutorily-defined as the date after which the employee is not reasonably anticipated to have further medical recovery or improvement from the injury, see § 440.02(10), Fla. Stat., whereas the date temporary benefits cease by operation of law has nothing to *469 do with the employee’s ultimate medical condition or prognosis. Additionally, the dissent’s interpretation would have the effect of authorizing a class of pre-MMI disability benefits — whether characterized as “temporary PTD” or “continuing/extended TTD” — that are not authorized by statute and that have been previously disavowed by this court. See Quintana, 1 So.3d at 390-91 (reversing pre-MMI award of “ ‘temporary’ PTD benefits” and distinguishing cases authorizing “temporary” award of PTD benefits based on the claimant’s post-MMI status); and cf. Oswald, 710 So.2d at 101 (Padovano, J., concurring) (explaining that pre-MMI award of PTD benefits based on the claimant’s condition at the expiration of the 2-year period for temporary benefits would subvert the statutory limit on temporary benefits).
78 So.3d at 626 n. 6. Accord Oswald, 710 So.2d at 100 (Padovano, J., concurring) (joining the majority opinion “in all respects” and “writfing] separately to explain why other possible interpretations of the Worker’s Compensation Law must be rejected”).
The fact that Westphal was unable to meet his burden of proof is not, in my view, a legitimate justification for receding from Hadley. First, the purpose of the rule was not, as the majority contends, “to ensure a continuous flow of disability benefits for those who are truly disabled;” the purpose of the rule was to enable totally disabled claimants who are not yet at MMI, but who will be permanently and totally disabled upon reaching MMI, to begin receiving PTD benefits earlier than the law otherwise would allow. Second, even if the majority was correct regarding the purpose of the rule, it does not follow that every claimant must prevail in order for the rule to be valid because, by statute, PTD benefits are available to only a limited class of claimants and “truly,” but not permanently, disabled claimants are not within the class. See § 440.15(l)(b), Fla. Stat. (“Only claimants with catastrophic injuries or claimants who are incapable of engaging in employment ... are eligible for permanent total benefits. In no other case may [PTD benefits] be awarded.”) (emphasis added).
The majority cites the handful of cases in which Oswald was applied and extrapolates from the results in those cases that “the rule in Oswald is now used almost exclusively as authority to deny benefits.” This is rank speculation. We have no way of knowing whether these cases are a representative sample of all of the cases in which Oswald has been applied. Indeed, it is quite possible that there have been hundreds, if not thousands, of cases over the past 15 years that were not litigated, not appealed, or were not the subject of written opinions in which injured employees received PTD benefits prior to MMI based on the rule announced in Oswald. And, in any event, the fact that this issue has arisen in only a handful of opinions over the past 15 years suggests that the rule was workable and not in need of a judicial overhaul.[14]
*470 With respect to the merits of the majority opinion, I agree with the criticisms leveled by Judge Thomas in his concurring in result only and dissenting in part opinion, see supra, at 456-57, and stand by the analysis of section 440.15 in my opinion for the en banc court in Hadley. I will not repeat that analysis here, except to quote the following passage explaining why, under a proper interpretation of the statute, entitlement to PTD benefits must be based on the claimant’s condition at MMI, rather than the claimant’s condition upon expiration of TTD benefits:
The remaining question is whether section H0.15(3)(a)i. [now section 110.15(3) (d)] requires an evaluation of the impairment at the time of the medical examination (during the six-week period before the temporary benefits expire), or at the time the employee will subsequently reach [MMI]. As the court explains, the answer to this question is that the doctor must evaluate the injured employee to determine the prospective level of impairment when the employee is at [MMI]. The opinion will be subjective, but no more so than other kinds of projections we ask medical experts to make. In any event, the evaluation must be made prospectively to preserve the distinction between temporary and permanent benefits.
If we were to construe section 440.15(3)(a)4. [now section 440.15(3)(d) ] to mean that the doctor must determine the degree of impairment at the time of the medical examination, we would then subvert the two-year limit in section 440.15(2)(a) for the payment of temporary benefits. An injured worker may have a high impairment rating at the time of the examination, and yet have a low impairment rating subsequently, at the time of [MMI]. Arguably, one solution would be to award [PTD] benefits based on the current degree of impairment and then revisit the employee’s eligibility under section 110.15(1) (d) when the employee reaches [MMI]. The weakness in this approach is that it treats what may be a temporary disability as permanent and extends the payment of benefits beyond the two-year limit.
Hadley, 78 So.3d at 625 (quoting Oswald, 710 So.2d at 101 (Padovano, J., concurring)) (emphasis added).
The majority claims that its interpretation of section 440.15 “does not extend temporary benefits beyond the statutory limit,” but as recognized in the language quoted above, that is precisely what it does. Henceforth, under the rule adopted by the majority, any injured employee who establishes that he or she is still totally disabled upon expiration of the 104-weeks of TTD benefits will be at so-called “statutory MMI”[15] and will be entitled to immediately begin receiving PTD benefits as a matter of law. Such benefits — which, as noted in Hadley, are more aptly characterized as “temporary PTD” or “continuing/extended TTD” — will presumably continue until such time as the employee reaches MMI and the true extent of his permanent impairment is determined or the employer/carrier is able to prove that *471 the employee has regained earning capacity. This court has long, and rightly, eschewed the judicial creation of this type of benefit.
I recognize that section 440.15, as written, may result in a “gap” in disability benefits where, as here, the claimant is totally disabled after the expiration of TTD benefits but is unable to prove that he will be permanently and totally disabled upon reaching MMI.[16] This problem predated the current version of the statute and was acknowledged by the Florida Supreme Court in 1969. See Thompson v. Fla. Indus. Comm’n, 224 So.2d 286, 287 (Fla.1969) (explaining that carrier was justified in ceasing payments of TTD benefits after the then statutory limit of 350 weeks even though claimant had not reached MMI and was still totally disabled and noting that the “Florida Workmen’s Compensation Act is inadequate in failing to provide for a situation such as this.”). The solution to this problem — assuming one is needed — is for the Legislature to revise the statute.[17] Id.; accord Hadley, 78 So.3d at 626.
*472 Accordingly, we should adhere to the rule announced in Oswald and reaffirmed in Hadley and leave it to the Legislature to determine whether, and how, to fill the “gap” in disability benefits to claimants such as Westphal who are unable to meet their burden of proof under Oswald.
II
Judge Thomas’ concurring in result only and dissenting in part opinion would adhere to Hadley, but would reverse the order on appeal on the basis that there is no competent substantial evidence to support the JCC’s finding that Westphal did not prove that he will be permanently and totally disabled upon reaching MMI. I agree with the portion of the opinion explaining why we should adhere to Hadley, but I disagree with the remainder of the opinion.
There was conflicting evidence — both medical and vocational — as to whether Westphal would be permanently and totally disabled upon reaching MMI. Dr. Hayes, the independent medical examiner, testified that Westphal would be totally disabled upon reaching MMI. By contrast, Dr McKalip, Westphal’s treating physician, testified that it was too soon after surgery to determine the extent of Westphal’s permanent work restrictions once he reaches MMI,[18] but he also testified that Westphal will likely be able to perform at least sedentary work in the future.[19] Westphal’s vocational expert testified that from a vocational perspective Westphal is not able to perform any sedentary work within a 50-mile radius of his home. By contrast, the vocational expert presented by the employer/carrier testified that he was unable to determine what work Westphal could perform after MMI until he knew what permanent work restrictions would be assigned by Dr. McKa-lip.
The JCC, as the fact-finder, was responsible for resolving these conflicts in evidence.[20] See Chavarria v. Selugal Cloth *473 ing, Inc., 840 So.2d 1071 (Fla. 1st DCA 2003) (en banc) (reaffirming Jefferson Stores, Inc. v. Rosenfeld, 386 So.2d 865 (Fla. 1st DCA 1980), in which the court held that “[i]t is the [JCC]’s function to determine credibility and resolve conflicts in the evidence, and he may accept the testimony of one physician over that of several others” (citations omitted)). The JCC explained in his order why he accepted the testimony of Dr. McKalip over the testimony of Dr. Hayes, and he further explained why, based on Dr. McKalip’s testimony, Westphal failed to meet his burden of proof. We have no authority to second-guess these findings.
Dr. McKalip testified that all of his opinions were within a reasonable degree of medical certainty, and as Judge Padovano noted in his concurring opinion in Oswald, the doctor’s opinion on the injured employee’s prospective, post-MMI condition is “subjective, but no more so than other kinds of projections we ask medical experts to make.” 710 So.2d at 101 (Padova-no, J., concurring). Thus, unlike Judge Thomas, I see no basis to conclude that the Dr. McKalip’s testimony concerning West-phal’s post-MMI disability status and potential future ability to work is so lacking that it could not be given any weight by the JCC. Accordingly, contrary to the premise underlying Judge Thomas’ concurring in result only and dissenting in part opinion, Dr. Hayes’ testimony was not “uncontroverted” and it could be properly rejected by the JCC if he explained his reasons for doing so, which he did.
The fact that there was evidence that would support a finding that Westphal would be permanently and totally disabled upon reaching MMI is immaterial to our review. See Pinnacle Benefits, Inc. v. Alby, 913 So.2d 756, 757 (Fla. 1st DCA 2005) (explaining that findings in a compensation order will be upheld if supported by any competent substantial evidence and that “[i]t matters not that other persuasive evidence, if accepted by the JCC, might have supported a contrary ruling”) (em-(emin original). It is not the function of the appellate court to reweigh the evi-evibefore the JCC, even if we think the JCC should have accepted the testimony of one witness over the other. See Fla. Min-Min& Materials v. Mobley, 649 So.2d 934, 934 (Fla. 1st DCA 1995) (rejecting argu-arguthat this court should undertake an independent review of the medical evi-evibecause “the case may not be re-reon appeal, and a ruling which is supported by competent substantial evi-eviwill be upheld even though there may be some persuasive evidence to the contrary.”).
In sum, the JCC discredited the evidence that Westphal would be permanently and totally disabled when he reached MMI and relied instead on the testimony of a doctor who said that he was not certain that would be the case. On this conflicting evidence, the JCC was entitled to find that Westphal’s future disability status was uncertain and with that assessment of the evidence, the JCC was correct in concluding that the claim for PTD benefits was not proven. This is so because if evidence of Westphal’s future recovery was speculative or uncertain, it cannot be said that he sustained his burden of proof under Oswald and Hadley. See Mitchell v. XO Communications, 966 So.2d 489, 490 (Fla. 1st DCA 2007) (explaining that the claimant has the burden to prove entitlement to PTD benefits and, to do so, the claimant must present evidence the JCC finds persuasive).
[[Image here]]
*474 For the foregoing reasons, I would affirm the order denying Westphal’s petition for PTD benefits.

. The panel opinion declared the 104-week limitation on TTD benefits in section 440.15(2)(a) unconstitutional using an erroneous analysis that, if allowed to stand, could have led to the incremental dismantling of entire workers' compensation system. See 38 Fla. L. Weekly D504 (Fla. 1st DCA Feb. 28, 2013). The main flaw in the panel's analysis was that it focused on the limitation on TTD benefits and the potential "gap” in disability payments in isolation rather than assessing whether despite these issues, the workers' compensation system as a whole remains a viable alternative to tort litigation. See, e.g., Martinez v. Scanlan, 582 So.2d 1167 (Fla.1991); Acton v. Ft. Lauderdale Hosp., 440 So.2d 1282 (Fla.1983); Sasso v. Ram Prop. Mgmt., 431 So.2d 204 (Fla. 1st DCA 1983); John v. GDG Servs., Inc., 424 So.2d 114 (Fla. 1st DCA 1982). It certainly does for West-phal because it is highly unlikely that he would have ever had a tort claim against his employer for the injury at issue in this case, but he has nevertheless been provided hundreds of thousands of dollars of free medical care along with indemnity and impairment benefits.

. I say "mentioned" rather than "raised” because it is well-settled that amicus curiae may not raise an issue not presented by the parties. See Acton v. Ft. Lauderdale Hosp., 418 So.2d 1099, 1100-01 (Fla. 1st DCA 1982).

. See Brief of Amicus Curiae Associated Industries of Florida, et al., at 8-10 (discussing the "principle of judicial restraint called the 'last resort rule,’ in which the court will refrain from considering a constitutional question when the case can be decided on non-constitutional grounds” and suggesting reconsideration of Hadley as one possible non-constitutional ground); Brief of the Florida Senate and the Florida House of Representatives as Amici Curiae in Support of Appellees, at 20 ("Although the Legislature urges this Court to reaffirm the consistent interpretation it has provided to this 20-year old statutory provision, this Court has the authority and obligation to recede from its precedent if necessary to preserve a constitutional outcome.").

. Judge Wolf suggests in his concurring opinion that the rule adopted in Oswald is flawed because it “put doctors in an untenable position of looking into a crystal ball and speculating on the future.” But the testimony required by the rule is no different than the kind of opinions that medical experts are routinely asked to give in personal injury, medical malpractice, and a myriad of other types of cases. See Oswald, 710 So.2d at 101 (Pa-dovano, J., concurring) (noting that a doctor's opinion on the injured employee’s prospective, post-MMI impairment is "subjective, but no more so than other kinds of projections that we ask medical experts to make”).

. Although the majority opinion does not use this term, the concept is clearly embodied in the holding that a totally disabled claimant "is deemed to be at [MMI]” upon the expiration of 104 weeks of TTD benefits. Compare supra, at 445-46 with Hadley, 78 So.3d at 629 (Padovano, J., dissenting) (explaining that "statutory MMI” is the colloquial term used to describe the situation when MMI exists "as a matter of law” upon the expiration of TTD benefits, and asserting that an injured worker who is still totally disabled at the end of the maximum period of eligibility for TTD benefits should be "deemed to be at [MMI], regardless of any potential for improvement”).

. The "gap” in this case was only approximately nine months because Westphal’s eligibility for TTD benefits statutorily ended on December 11, 2011 and, according to documents filed in this court by Westphal, he was "voluntarily accepted] as PTD effective 9/21/12.” Additionally, it is noteworthy that Westphal was not without income during the "gap” period as the record reflects that he was receiving approximately $2,700 per month from his pension and $2,100 per month in Social Security Disability benefits during this period.

. Judge Wolf states in his concurring opinion that if the majority’s new interpretation of section 440.15 is incorrect, "the legislature may address it.” That is certainly true, but it does not justify the majority's decision to recede from Hadley because the same could be said of the interpretation adopted in Oswald: if that interpretation was incorrect, the Legislature could have — and presumably would have — addressed it at some point during the past 15 years. Indeed, over that same period, the Legislature did not hesitate to enact statutory amendments to “correct” judicial interpretations that it found inconsistent with legislative intent. See, e.g., State v. Adkins, 96 So.3d 412, 415 (Fla.2012) (discussing section 893.101, which was adopted in response to Scott v. State, 808 So.2d 166 (Fla.2002), and Chicone v. State, 684 So.2d 736 (Fla.1996), and which specifically referred to those decisions as being "contrary to legislative intent”); Kauffman v. Cmty. Inclusions, Inc./Guarantee Ins. Co., 57 So.3d 919, 920 (Fla. 1st DCA 2011) (recognizing that the Legislature’s deletion of the word "reasonable” in section 440.34 was a direct response to the supreme court’s decision in Murray v. Mariner Health, 994 So.2d 1051 (Fla.2008)); Pearson v. Paradise Ford, 951 So.2d 12, 16 (Fla, 1st DCA 2007) (recognizing that the 2003 amendments to section 440.09(l)(b) were intended to "overrule” this court's interpretation of the phrase "major contributing cause” in Closet Maid v. Sykes, 763 So.2d 377 (Fla. 1st DCA 2000) (en banc)); Dep't of Health v. Merritt, 919 So.2d 561, 564 (Fla. 1st DCA 2006) (recognizing that the 2003 amendments to chapter 120 "legislatively overruled” this court’s decision in Florida Board of Medicine v. Academy of Cosmetic Surgery, Inc. 808 So.2d 243 (Fla. 1st DCA 2002)); Douglas v. Fla. Power & Light, Inc., 921 So.2d 750, 753 (Fla. 1st DCA 2006) (recognizing that the 2003 amendments to section 440.15(l)(e)l. "effectively overruled” this court's decision in Eckert v. Publix Supermarkets, Inc., 783 So.2d 1187 (Fla. 1st DCA 2001)) (quoting John J. Dubreuil, Florida Workers' Compensation Handbook, § 13.52[5][b] (2005)); Barfield v. Dep't of Health, 805 So.2d 1005, 1011 (Fla. 1st DCA 2002) (recognizing that the 1999 amendments to section 120.57(1)(Z) were a "direct legislative response” to this court’s decision in Department of Children & Families v. Morman, 715 So.2d 1076 (Fla. 1st DCA 1998), and an acceptance of the dissenting opinion in that case); Sw. Fla. Water Mgmt. Dist. v. Save the Manatee Club, Inc., 733 So.2d 594, 599 (Fla. 1st DCA 2000) (recognizing that the 1999 amendments to section 120.52(8) rejected the standard adopted by this court in St. Johns River Water Management District v. Consolidated-Tomoka Land Co., 717 So.2d 72 (Fla. 1st DCA 1998)); Consolidated-Tomoka, 717 So.2d at 79 (recognizing that the 1996 amendments to section *472 120.52(8) "overrule[d]” a number of judicial decisions to the extent they established the test to determine the validity of an administrative rule). But the Legislature did not do so here, apparently because it agreed with the interpretation adopted in Oswald. See Brief of the Florida Senate and the Florida House of Representatives as Amici Curiae in Support of Appellees, at 9, 18.

. Dr. McKalip testified that he was not yet able to determine Westphal’s permanent restrictions because he had not seen Westphal for a detailed post-surgery physical exam. He further testified that Westphal would be in a brace for three months and then have to undergo approximately six months of rehabilitation and, thus, Westphal would likely not be at MMI until nine months after surgery.

. [Westphal’s counsel]: Okay. At this point in time, Doctor, are you able to forecast what some of his permanent restrictions may be, based upon your experience with these type of surgeries?
[Dr. McKalip]: Well, yeah. You know, this is speculation, but it’s highly informed, and I think, you know, highly probable, that he’s going to have permanent weakness in his leg that prevent[s] him from, you know, applying any force to his body that, you know, can't be supported by his weak leg. He certainly won’t be able to do any sort of high intensity, you know, high impact job, or any work that would require him to rely on his leg, without question.
I think he will be able to do other work, sedentary work, and maybe mild activities; but he's going to be, most probably be severely limited because of his weakness.
(emphasis added).

.Judge Thomas’ concurring in result only and dissenting in part opinion suggests that the JCC was required to appoint an expert medical advisor (EMA) to resolve the conflicts in the medical opinions. However, neither party requested the appointment of an EMA and the JCC’s failure to appoint an EMA sua sponte is not fundamental error. See Quiroga v. First Baptist Church at Weston, 124 So.3d 936, 2013 WL 163430 (Fla. 1st DCA Jan. 16, 2013). Moreover, any error in the failure to *473 appoint an EMA was not raised as an issue on appeal.